# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### April 24, 2001 Session

## STATE OF TENNESSEE v. WILLIAM R. STEVENS

**Appeal from the Criminal Court for Davidson County**
**No. 98-A-825     Steve Dozier, Judge**

---

### No. M1999-02067-CCA-R3-DD - Filed May 30, 2001

---

The Defendant, William R. Stevens, was convicted of two counts of first degree premeditated murder and one count of especially aggravated robbery, arising out of the deaths of his wife and mother-in-law. For each of his murder convictions, he was sentenced to death. He now appeals as of right, raising the following eleven issues for our review: (1) whether it was error to limit the testimony of crime-scene expert Gregg McCrary; (2) whether it was error to exclude evidence which tended to show that Corey Milliken had an independent motive to commit the murders; (3) whether it was error to admit a redacted version of Sandi Stevens' diary; (4) whether the trial court failed to apply the hearsay and other evidentiary rules in an evenhanded manner; (5) whether the hearsay statements of Corey Milliken to Sarah Suttle should have been excluded as not being "in furtherance of the conspiracy"; (6) whether the cumulative effect of all errors at trial violated the Defendant's right to due process of law; (7) whether instructing the jury that it must agree unanimously in order to impose a life sentence and prohibiting it from being told the effect of a non-unanimous verdict violates the Eighth and Fourteenth Amendments; (8) whether the Tennessee Code Annotated section 39-13-204(i)(4) aggravating circumstance fails to narrow the class of death-eligible defendants in violation of the Eighth and Fourteenth Amendments; (9) whether the failure to articulate meaningful standards for proportionality review mandated by Tennessee Code Annotated section 39-13-206 violates the Defendant's right to due process under the Fourteenth Amendment; (10) whether the unlimited discretion vested in the prosecutor as to whether or not to seek the death penalty violates the Eighth and Fourteenth Amendments; and (11) whether the death penalty is imposed in a discriminatory manner in violation of the Eighth and Fourteenth Amendments. After a thorough review of the record and the relevant legal authorities, we find no reversible error on the part of the trial court. Accordingly, we affirm the Defendant's convictions and his sentences of death.

### Tenn. Code Ann. § 39-13-206 Death Penalty Appeal; Judgment of the Criminal Court Affirmed

DAVID H. WELLES, J., delivered the opinion of the court, in which NORMA McGEE OGLE and ALAN E. GLENN, JJ., joined.

Brock Mehler and Michie Gibson, Jr., Nashville, Tennessee, for the appellant, William R. Stevens.

Paul G. Summers, Attorney General and Reporter; Michael E. Moore, Solicitor General; Jennifer Smith, Assistant Attorney General; Victor S. Johnson, District Attorney General; and Tom Thurman, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The Defendant was convicted of two counts of first degree premeditated murder for the double murder of his wife, Sandi Stevens, and his mother-in-law, Myrtle Wilson. He was also convicted of especially aggravated robbery of Sandi Stevens, arising out of the same occurrence. Both Sandi Stevens and Myrtle Wilson were found dead in their home in their respective bedrooms on December 22, 1997. Sandi Stevens was found laying on her bed nude, with pornographic magazines around her head and a photo album containing nude photographs of her on the bed. Myrtle Wilson was also found laying on her bed; her nightgown had been pulled up and her underwear was on the floor. The medical examiner determined that Myrtle Wilson died from stab wounds and manual strangulation, and Sandi Stevens died from ligature strangulation. Several items of Sandi Stevens' were taken from the trailer, giving rise to the robbery charge. The Defendant's convictions for these crimes were based on the theory of criminal responsibility for the actions of another. The State's proof at trial established that the Defendant hired his eighteen-year-old neighbor and employee, Corey Milliken, to kill his wife and mother-in-law and to make it look like a robbery. The Defendant's theory was that Corey Milliken fabricated a "murder for hire fantasy" and that he killed Sandi Stevens and Myrtle Wilson in the perpetration of a sexual assault.

### FACTS -- GUILT PHASE

During the guilt phase of the Defendant's trial, Larry Wilson, the son of victim Myrtle Wilson and the brother of victim Sandi Stevens, testified that the Defendant and Sandi Stevens had been married approximately three years. Ms. Wilson had been living with her daughter and son-in-law for about six months prior to her death. In October of 1997, Ms. Wilson visited her son in Colorado, where he lived. Mr. Wilson said that his mother was very forgetful during that visit.

Larry Wilson testified that his mother had assets totaling $82,000, which she had asked him to manage for her. Pursuant to her request, Mr. Wilson invested the money in CDs. Ms. Wilson lived off the interest from the CDs. Around Thanksgiving of 1997, Mr. Wilson had a conversation with his mother in which she expressed concern about her finances, and Mr. Wilson agreed to visit around Christmas and examine her finances for her. However, on December 22, 1997, Mr. Wilson was informed that his mother and sister had been murdered. He subsequently examined his mother's financial information and discovered a $4,000 check dated June 10, 1997, made out to the Defendant. Mr. Wilson testified that the check was "printed" instead of written and that his mother never printed her checks. He further testified that his mother's handwriting was "shaky" because she had gotten "rather feeble," and the printing on the check was too clear to be his mother's writing. In addition, Mr. Wilson said that on the duplicate check, it appeared that the check had been written for $40 rather than $4,000, but that amount had been crossed out.

Doris Trott, a hairdresser, testified that she had known Myrtle Wilson and Sandi Stevens since 1992 when they first started coming to the hair salon in which she worked. She had also met

the Defendant. She told the jury that in the fall of 1997, she overheard part of a conversation between Ms. Wilson and the Defendant regarding money. After the Defendant left the salon, Ms. Wilson told her that she was not going to loan the Defendant money anymore because he never repaid her. Later that fall, Ms. Wilson told Ms. Trott that the Defendant had asked her to sign some papers for a life insurance policy on her life in the amount of $10,000, but she was not going to sign the papers.

Bart Salvaggia, Sandi Stevens' son-in-law, testified that he and his wife, Sandi Stevens' daughter, Alisa, visited Ms. Stevens and the Defendant in their home the weekend before the murders. They were there to celebrate Christmas and had brought presents, and Mr. Salvaggia found it strange that the Defendant did not have any presents for Sandi Stevens or Myrtle Wilson. Mr. Salvaggia testified that the Defendant stated several times that he was going to buy presents for them on the following Tuesday.

Mr. Salvaggia also testified that while he was there on Saturday, Corey Milliken entered the residence, had a conversation with the Defendant, got some keys off the night stand, left for a few minutes, and then came back. Either before or after Corey Milliken was at the trailer, the Defendant called Mr. Milliken about six times; the Defendant would dial the number, say, "What are you doing," and then hang up the phone.

Gary Clements, a police officer with the Metropolitan-Nashville (Metro) Police Department, testified that on December 22, 1997, he was dispatched to 1508 Dickerson Road, which was a mobile home park. He arrived a few minutes after 9:00 a.m. and was met by the Defendant and Shawn Austin outside the Defendant's trailer. Officer Clements entered the trailer along with Officer John Donnelly and two fire department officers. Upon entering the trailer, the officers discovered two bodies. After ascertaining that the victims did not need medical assistance, the officers secured the scene, called for supporting officers from homicide and identification, and began canvassing the area for witnesses. While going door-to-door looking for witnesses, Officer Clements saw Corey Milliken. Corey Milliken lived three trailers down from the Defendant's trailer. Officer Clements testified that he observed a gouge mark on Mr. Milliken's right cheek and another mark on his left wrist. The marks appeared fresh; they were red and irritated. Officer Clements said that he also observed spots on Mr. Milliken's white tee shirt that appeared to be blood, and he observed what appeared to be blood around and under Mr. Milliken's fingernails. He turned Mr. Milliken over to a police detective and then continued searching for witnesses. Around 2:20 in the afternoon, Officer Clements discovered a trailer that had its underpinning pulled loose, and Officer Clements observed a canvas bag under the trailer. He notified the homicide detectives and identification personnel so that the bag could be photographed and removed.

Detective Brad Corcoran, also with the Metro Police Department, testified that he was assigned to the identification section as a crime scene investigator in December 1997. He, along with Officer Ray Radar, was assigned to investigate this crime scene. Detective Corcoran testified that he arrived at the scene around 9:40 a.m. He observed pornographic magazines displayed and opened on the bed around Sandi Stevens' body in the master bedroom. He also observed a photo

album containing nude photographs of Sandi Stevens on the bed. He and Officer Radar attempted to obtain fingerprints, and they lifted about thirty latent fingerprints from the crime scene, including prints from the magazines and the photo album. The magazines and photo album were also tested for the presence of blood, but none was detected.

Detective Corcoran prepared a diagram of the crime scene, which was used to explain the crime scene to the jury. Detective Corcoran also identified photographs of the crime scene and described what was depicted in the photographs. He identified the photographs of the contents of the green canvas bag which was found under a nearby trailer; the bag contained an eight-inch kitchen or butcher knife with what appeared to be bloodstains on it, a white tee-shirt with blood on it, various articles of jewelry, numerous pills, and a thirty-five millimeter camera.

On cross-examination, Detective Corcoran testified that the crime scene was consistent with other sex crime scenes that he had worked in that the victims were either nude or partially nude, but he was unable to determine whether any sexual activity had occurred from looking at the crime scene. However, he stated that "the entire scene appeared to be staged in my opinion." He explained that the Christmas tree was laying on its side, but none of the glass balls on the tree were broken, indicating that the tree was laid down rather than knocked down. In Myrtle Wilson's room, the contents of a purse had been dumped out on the floor, but it did not appear as though the contents had been rifled through or removed. Also in Ms. Wilson's room, the drawers of a dresser had been opened, but it did not appear as though anything had been "moved hastily or pulled out." In Sandi Stevens' room, clothes had been taken from the closet and simply placed on the floor, and the items on the bed appeared to have been placed there. Detective Corcoran testified that there was no evidence of forced entry.

Officer Danny Morris with the identification division of the Metro Police Department testified that he received all of the latent fingerprints lifted from the crime scene at 1508 Dickerson Road. Out of thirty-eight prints that he received, five usable, identifiable prints were obtained. One from the jewelry box in the master bedroom matched the Defendant's prints, and the remaining four matched Sandi Stevens' prints. No fingerprints matching Corey Milliken were found at the crime scene.

Shawn Allen Austin testified that in December of 1997, he was fifteen years old and he lived at 1508 Dickerson Road, lot A3, with his mother, his step-father, and his brother, Corey Milliken. He and his brother worked for the Defendant putting underpinning on trailers, and they also saw the Defendant regularly outside of work. Mr. Austin testified that Corey Milliken and the Defendant had a "close" relationship, but Mr. Milliken did not "get along too well" with Sandi Stevens.

Mr. Austin informed the jury that in the fall of 1997, he was involved in a discussion with the Defendant and his brother, Corey Milliken, about the Defendant's ex-wife. He said that the Defendant wanted Mr. Milliken and him to kill the Defendant's ex-wife. The Defendant told them to get a rifle, stand on a hill by her house, and then shoot her when she came out of the house. The Defendant said that he wanted to kill his ex-wife so he could get custody of his son, John, and so he

could get his ex-wife's car, trailer, and land. At the time of the discussion, Corey Milliken agreed to the murder. However, around Thanksgiving of 1997, Mr. Austin was involved in another discussion with the Defendant and Mr. Milliken. At this time, the Defendant informed the two brothers that he wanted to kill his current wife and mother-in-law rather than his ex-wife. Mr. Austin was to act as the "lookout" while Mr. Milliken committed the murders. Mr. Milliken was to use a gun, but if he could not acquire a gun, he was to use a knife. The Defendant told them to kill his mother-in-law first and then kill his wife because his wife would not hear the other murder due to the doors being shut and the fan running. The brothers were to receive $2,500 each for the murders. According to Mr. Austin, the Defendant said the money would come from an insurance policy, or if he could not recover from the insurance policy, he would have a yard sale to get the money.

Mr. Austin testified that some time later, the Defendant took Mr. Milliken on a "walk through" of the trailer, telling Mr. Milliken what to take. During this "walk through," Mr. Austin was sitting on the couch. However, he said that the Defendant told Mr. Milliken to take the pills and the jewelry and to put everything in a bag. The Defendant told Mr. Milliken to tear up certain things but specifically instructed Mr. Milliken not to tear up the TV, the dishes, or his Star Trek collection. Mr. Milliken would enter the trailer by using a pass key; the alarm would not be set. After committing the murders, Mr. Milliken was supposed to "destroy" the trailer to make it look like a robbery. Mr. Milliken was supposed to throw the murder weapon on top of the school building, which was nearby, and to throw the bag into the river. He was then supposed to go to his girlfriend's house to establish an alibi. Mr. Austin said that he told the Defendant and Mr. Milliken he was not going to be the "lookout," so his role in the killings was changed to that of an alibi for the Defendant. Mr. Austin was supposed to go to work with the Defendant on the day of the murders, and if questioned by the police, he was supposed to say that he saw Sandi Stevens wave at them that morning when they left. He would not receive any money for this participation; all the money would go to Mr. Milliken.

Mr. Austin stated that he asked Corey Milliken if he was really going to do it, and Mr. Milliken responded, "yeah." Mr. Austin said that he tried to talk his brother out of the killings, but Mr. Milliken said he was going to do it, and he was going to wear gloves so that he would not get caught. The Defendant told the two brothers that if one of them got caught by the police, he was not to "snitch on the other person," and he was to refuse to take a lie detector test. A few days prior to the murders, another discussion took place between the Defendant and the two brothers in the Defendant's truck. Mr. Austin testified that the Defendant told them the murders had to take place on December 22 because the Defendant would have his son, John, and he could use his son as an alibi.

Mr. Austin testified that on Monday, December 22, 1997, he went to the Defendant's trailer at about 4:45 a.m. Sandi Stevens and Myrtle Wilson were not awake at this time. Mr. Austin left with the Defendant and the Defendant's son, John, and they drove to White Bluff where they were planning to work that day. They did not actually work that day, but instead returned to Nashville at about 8:30 a.m. When they returned, they went to the Defendant's trailer and opened the door. They could see that the trailer was "all destroyed." They went a couple of steps into the trailer and then

turned around and left. They went to Mr. Austin's trailer and called 911. The Defendant left and was gone for around ten minutes. John stayed at the trailer with Mr. Austin. Mr. Austin stated that Corey Milliken was at the trailer when he arrived and that Mr. Milliken told him what happened. He said that Mr. Milliken told him that he had stabbed the Defendant's mother-in-law, strangled the Defendant's wife, and then "tore up the house."

When initially questioned by the police, Mr. Austin did not tell the truth. He said that he told the police he had seen Ms. Stevens wave that morning, and he did not tell the police about his brother's involvement. However, the next day he went to the police station with his mother and step-father and told the police the truth.

Mr. Austin testified that he did nothing to protect Ms. Stevens and Ms. Wilson because he did not believe his brother would go through with the plan. He said that the Defendant changed the plan from killing his ex-wife to killing his current wife and mother-in-law because he did not want to pay his wife's bills anymore and "he did not want to hear her griping no more." He also said that killing his wife would be easier than going through a divorce. Mr. Austin said the Defendant wanted to kill his mother-in-law so that he would get her money. According to Mr. Austin, the Defendant said that if his mother-in-law died, his wife would inherit one-third of her money, and if his wife also died, he would inherit her share because he was her husband.

Mr. Austin stated that on the morning of December 22, Mr. Milliken was in bed asleep when he left to go to work with the Defendant. He said that Mr. Milliken had gotten into an argument with their step-father the night before and had left home. Mr. Milliken returned later and was sitting on the front porch at 2:30 a.m.

Mr. Austin also reported that Mr. Milliken was sexually infatuated with Ms. Stevens. He said Mr. Milliken told him that the Defendant had shown Mr. Milliken a photo album containing nude pictures of Sandi Stevens and that the Defendant had told Mr. Milliken that Sandi Stevens wanted to have sex with Mr. Milliken and the Defendant at the same time. Mr. Austin further reported that Mr. Milliken lied regularly and that his motto was "I lie to get by." He testified that the night before the murders, Mr. Milliken stole the pass key out of the Defendant's truck. The Defendant called Mr. Milliken's mother that night and informed her that Mr. Milliken had taken the key.

Rick Austin, Shawn Austin's father, testified that Shawn Austin was not living with him in 1997, but they saw each other occasionally. Approximately two weeks before the murders, Shawn told him that the Defendant wanted Corey Milliken to murder his wife. Rick Austin said that he dismissed it as "kid talk" and told Shawn to just stay away from the Defendant.

Chris Holman testified that he dated the sister of Corey Milliken's ex-girlfriend and that he knew Mr. Milliken through that relationship. He said that around the end of October 1997, Mr. Milliken approached him and asked him if he could get a gun with a silencer. Mr. Holman refused. About three weeks prior to the murders, Mr. Milliken again approached Mr. Holman and asked Mr.

Holman if he wanted to go in on a "hit." According to Mr. Holman, Mr. Milliken said that he was supposed to do a "hit" on his boss's ex-wife and her mother. He was to go into the house and make it look like a burglary, and he would be paid $5,000. He offered to split the money evenly with Mr. Holman, but Mr. Holman refused.

Sarah Suttle, Corey Milliken's ex-girlfriend, testified that she and Mr. Milliken were dating in December 1997, and they had been dating for almost a year. Ms. Suttle was sixteen years old at the time. She had met the Defendant several times through Mr. Milliken. Ms. Suttle said that the Defendant and Mr. Milliken were "close"; the Defendant was "like a father" to Mr. Milliken.

In the fall of 1997, Mr. Milliken started talking to Ms. Suttle about making a large amount of money--$5,000. He told Ms. Suttle that he and the Defendant had a big job to do, but he initially would not tell her what the job was. Eventually Mr. Milliken told Ms. Suttle that the job was "killing somebody." About two weeks prior to the murders, Mr. Milliken told Ms. Suttle that he was supposed to shoot Sandi Stevens and Myrtle Wilson, that he was supposed to wear gloves, that he was not to break the dishes or the Star Trek collection, and that Shawn Austin was supposed to be the lookout. He also told her that after the murders, he was supposed to take some jewelry, throw it in the river, and then go to her house to establish an alibi. Some time later, Mr. Milliken told Ms. Suttle that he did a "walk through" of the Defendant's trailer, and the Defendant showed him what to do in the bedrooms, what to take, what not to take, and where the knife was. For their participation, the Defendant was going to pay Mr. Milliken and Mr. Austin $2,500 each. According to Ms. Suttle, the Defendant was going to get the money to pay Mr. Milliken and Mr. Austin from an insurance policy or from a yard sale. Mr. Milliken told her that he was going to put some of the money in the bank and spend the rest on her.

Less than a week before the murders, Mr. Milliken told Ms. Suttle that Mr. Austin was not going to be the lookout but was instead going to go to work with the Defendant on the day of the murders. Because Mr. Milliken was going to commit the murders alone, he was going to get the entire $5,000. The night before the murders, Mr. Milliken told Ms. Suttle that he was afraid he would get caught and that he did not know what to do. Ms. Suttle said that she tried to talk him out of the murders and that she felt "pretty good" about it. However, she called Mr. Milliken at 8:15 a.m. the next morning, and he told her that he had done it. Mr. Milliken did not give her any specifics at the time, but he called her back thirty minutes later and told her that he first went into Myrtle Wilson's room, stabbed her, and then smothered her. He then went into Sandi Stevens room and choked her with an electrical cord. He said he then destroyed the house, took the jewelry, put it underneath the next trailer, and went back home. He told her that he was going to come over to her house and for her to tell the police that he was there at 8:00 a.m. if they asked, but he never came over. Later that morning, Ms. Suttle had another conversation with Mr. Milliken. She said that he answered the phone in his regular voice, and then he started whispering to her. She said she could tell he was scared. He told her that he had to go because the Defendant was mad. Ms. Suttle testified that she confirmed around noon that day that the murders had actually occurred, and she discovered that Corey Milliken had been arrested when she watched the 6:00 news. At that point, she told her father what she knew about the murders. Her father called their pastor and then called

the police.  Ms. Suttle went to the police station at about 8:30 p.m. with her father and gave a statement.

On cross-examination, Ms. Suttle testified that Sandi Stevens was "like a mother" to Mr. Milliken.  She also testified that Mr. Milliken lied often and that he liked getting attention from everybody.  He wanted to fit in and "be part of the crowd."  She said that Mr. Milliken did not tell her anything about the victims being nude.  She further stated that she did not do anything to try to stop the murders because she did not think that Mr. Milliken would go through with it.

Timothy Suttle, Sarah Suttle's father, testified that he learned about the murders on the evening news.  Following the news, Sarah Suttle came to talk to him about what she knew, and he then called their pastor and took his daughter to the police station.

Billy Stevens testified that he is the step-father of both Corey Milliken and Shawn Austin.  They lived with him at 1508 Dickerson Road, lot A3.  Mr. Stevens said that both of his step-sons worked for the Defendant and that they were "pretty tight."  Mr. Milliken and Mr. Austin would go to the Defendant's house and watch movies with him and have water gun fights in the yard.

Mr. Stevens said that he arrived home about 9:30 or 10:00 in the morning on December 22 and found out about the murders.  Before he knew of Mr. Milliken's involvement, he had a discussion with the Defendant in front of his trailer.  According to Mr. Stevens, the Defendant approached him and said, "How do you know, Charlie, that Corey will say that me and you had something to do with this tomorrow, you know?"  Mr. Stevens said that he found this statement unusual.

Mr. Stevens told the jury that the night before the murders, he had a confrontation with Mr. Milliken.  The confrontation originated with a conversation about Mr. Milliken helping to pay for a pizza.  He said that Mr. Milliken "got smart with his mother," and Mr. Stevens grabbed Mr. Milliken.  Mr. Stevens characterized himself as the aggressor, rather than Mr. Milliken.  Mr. Milliken ran off after the confrontation, but returned early the next morning.  Mr. Stevens testified that they had been in arguments before and that Mr. Milliken had "run off before."

Detective Pat Postiglione, a homicide detective with the Metro Police Department, testified that he was one of the detectives assigned to investigate the murders of Sandi Stevens and Myrtle Wilson.  He transported Corey Milliken to the hospital to have a rape kit taken from Mr. Milliken.  He explained that this was standard procedure in homicide cases involving women, particularly when they are found in the condition in which these two victims were found.  He said that the case was originally investigated as potentially being a sex crime because one was of the victims was nude and the other victim was partially nude--she had her nightgown pulled up and her underwear pulled off.  Because of the potential that a sexual assault had occurred, Patty Goodman, a detective with the sex abuse unit, was called to the scene. Detective Postiglione explained that the term "displayed" refers to a victim that has been left in a "displayed position, for example, lying on their back with their legs spread and nude."  He said that Sandi Stevens was found in a "displayed" position.  She was laying

on the bed nude with pornographic magazines around her head. She also had blood on her knees, but she had not been stabbed. The blood on Ms. Stevens' knees probably came from Ms. Wilson, who had been stabbed. However, Detective Postiglione testified that while the term "displayed" is a term used in sex crimes, a victim may be left "displayed" without having been sexually assaulted. He said that he did not do any follow-up in this case to determine whether a sexual assault occurred because he was not the primary investigator.

Detective Postiglione testified that there were signs of a struggle in Myrtle Wilson's room in and about the bed area, but the living room area appeared to have been staged. He said that the Christmas tree was laying on its side, but none of the balls were broken or scattered about the room. The detective further testified that no life insurance policies or bank accounts were discovered showing the Defendant as the beneficiary or the direct recipient of funds.

Detective Al Gray, also a homicide detective with the Metro Police Department, testified that he was the lead investigator on this case. He said that when he arrived on the scene, he did a walk through. He did not see any signs of forced entry. He believed that someone had attempted to disguise the scene to make it seem like a burglary. He testified that in Ms. Wilson's room, drawers were pulled open but nothing was disturbed inside the drawers. In the living room, the tree was knocked over and the paper was removed from the Christmas presents, but the presents were not taken. Items were taken out of the closet and placed on the floor still on the hangers. In some areas, things did not appear to be disturbed at all, such as the office area, which looked like a valuable area of the trailer.

Detective Gray testified that he interviewed the Defendant and that he recorded the Defendant's statement. That statement was played for the jury. In that statement, the Defendant stated that the first thing he saw when he entered the trailer was the Christmas tree on the floor and things laying around. He said that he knew something was wrong, so he started walking toward his bedroom and calling for his wife. He saw his wife's leg off the side of the bed, and as a result, he immediately left the trailer and called 911 from a neighbor's house. He asserted that he did not go to his wife to check for vital signs or to offer her assistance because he assumed from seeing her leg that she was dead. Although he never saw his mother-in-law's body, he assumed that she was dead as well, based on his wife's leg hanging off the bed. He claimed that he did what he thought he was supposed to do -- not contaminate the scene and immediately call the police. When questioned about his relationship with Sandi Stevens, the Defendant reported that he loved his wife very much and that he deeply cared about his mother-in-law. He said that there were no problems in his marriage.

On cross-examination, Detective Gray testified that from the way Sandi Stevens was displayed, it appeared as though some sort of sexual activity might have taken place. "Displayed" is a term used in a sex crime. However, he said that he was just assuming when he arrived that sexual activity had taken place based on the victim being nude.

Detective Gray testified that he interviewed Corey Milliken and that Mr. Milliken admitted committing the murders. Mr. Milliken said that he acted alone in physically committing the murders.

Detective Gray followed up on Mr. Milliken's confession by interviewing Sarah Suttle, Shawn Austin, and the Defendant. He testified that Mr. Milliken knew things about the inside of the trailer that only the killer would know. During cross-examination, defense counsel vigorously interrogated Detective Gray about things he could have done to corroborate Mr. Milliken's confession but did not do. Detective Gray insisted that he did not need to do the things suggested by defense counsel because the crime was solved when Mr. Milliken confessed.

Alisa Salvaggia, Sandi Stevens' daughter, identified a diary as containing her mother's handwriting. Excerpts of the diary were passed to the jury. In that diary, Ms. Stevens expressed unhappiness with her marriage, though she stated that she did love the Defendant. She mentioned the possibility of ending her marriage with the Defendant. She also expressed dislike for Corey Milliken.

William Byers, Sandi Stevens' ex-husband, testified that he and Ms. Stevens divorced in 1992. However, he spoke to Ms. Stevens shortly before her death. He said that Ms. Stevens was upset about changes in the Defendant's behavior and arguments they were having, and she felt she had made a mistake in the marriage. He said that Ms. Stevens told him the Defendant had told her he would not allow her to leave.

Vickie Stevens, the Defendant's ex-wife, testified that she and the Defendant were married for eight and a half years and that they have a son together. She said that the Defendant had their son on December 22, 1997 because she had to have back surgery. She told the Defendant about the surgery at least a week before the murders. In addition, Ms. Stevens testified that within a week or two of the murders, the Defendant started sending her letters. In the first letter, the Defendant suggested that she and the Defendant get back together. The Defendant also sent her some money, which he said was child support for their son, John.

Lane Locke, a prisoner at West Tennessee State Penitentiary, testified that around the end of December 1997 and the beginning of January 1998, he was housed in the same cell as the Defendant at the Davidson County Criminal Justice Center. The Defendant was his cell mate for approximately three weeks. Mr. Locke testified that he had some legal background because he was a Metro police officer for approximately three years, and he had completed a paralegal correspondence course. He said that the Defendant discussed his case frequently and at great length while they were in the same cell. According to Mr. Locke, the Defendant said that he and his wife had a "great relationship," but the Defendant also stated that he was having an affair with a woman who cleaned the trailer sales place where he worked. The Defendant also told Mr. Locke that he did not want to go through another divorce because he felt as though it would "wipe him out."

Mr. Locke said that the Defendant described Corey Milliken as a "big, dumb kid." The Defendant had hired Mr. Milliken to help him put underskirting on mobile homes. The Defendant told Mr. Locke that he had shown Mr. Milliken some nude pictures of his wife and that he had taken Mr. Milliken to see a prostitute. He also said that his wife and mother-in-law did not feel comfortable with Mr. Milliken at the house.

Mr. Locke testified that he played the "devil's advocate," pointing out things in the Defendant's version of events that did not seem "quite right," and the Defendant's story would change as a result. For instance, the Defendant first told Mr. Locke that he did not go check on his wife after seeing her leg because he wanted to preserve the crime scene. After Mr. Locke stated that nobody would believe that, the Defendant said that he was trying to protect his son and Shawn Austin from seeing anything. Mr. Locke said that the Defendant never showed any remorse or emotion over his wife's death and that he did not want to go to his wife's funeral. He further told the jury that when the Defendant returned to their cell after his preliminary hearing, the Defendant was upset about the way Shawn Austin had been treated and stated, "Shawn is just as guilty as the rest of us, and he's the only one that's gonna get away with it. I can't believe those idiots thought I was gonna pay them."

Mr. Locke testified that he had already reached a plea agreement in his case when he reported these conversations to the authorities, and the only consideration he received for his information was a letter from the district attorney general to the parole board stating that he had assisted in a homicide investigation. David Baker, Mr. Locke's attorney, confirmed that Mr. Locke's plea agreement had already been reached prior to his coming forward with information and that the only favor Mr. Locke received was a letter to the parole board.

Michael Street, an inmate at the Criminal Justice Center, testified that he had charges pending for aggravated kidnapping. He met the Defendant at the Criminal Justice Center and did some art work for him. He said that the Defendant voluntarily paid him more than the usual amount for the art work. While at the Criminal Justice Center, Mr. Street also had contact with Corey Milliken. Mr. Street testified that the Defendant asked him to "more or less intimidate Corey Milliken or have him killed in one form or fashion" and that the Defendant mentioned another "guy" that he had hired to try to do it, but that person "got caught." Mr. Street refused the Defendant's request. He stated that he had not received any promises for his testimony.

John Lassiter, the Chief Investigator for Internal Affairs at the Davidson County Sheriff's Office, testified that he received information in May 1998 regarding two money orders payable to inmate Charles Randle from the Defendant. He said that it is not permissible for one inmate to send anther inmate money. As part of the investigation, letters were recovered from both the Defendant's cell and Mr. Randle's cell. Those letters were made exhibits and shown to the jury. In those letters, the Defendant offered Mr. Randle money to harm or intimidate Corey Milliken at the jail or later at the penitentiary.

Chad Johnson, a Special Agent Forensic Scientist with the Tennessee Bureau of Investigation, was certified as an expert in serology and DNA comparison. He testified that he tested the knife for the presence of blood, but the test results were "inconclusive." He also tested oral, anal, and vaginal swabs from Myrtle Wilson and Sandi Stevens for the presence of sperm. No sperm was detected on any of the swabs from Myrtle Wilson, and no sperm was detected on the oral and anal swabs from Sandi Stevens. Sperm was detected on the vaginal swab from Sandi Stevens, and that sperm was consistent with the DNA of the Defendant. Agent Johnson further testified that the blood

on the tee-shirt found in the green canvas bag was consistent with Myrtle Wilson, and the blood found on Sandi Stevens' hands was also consistent with that of Myrtle Wilson.

Dr. Emily Ward, a pathologist with the Davidson County Medical Examiner's Office, testified that she viewed the bodies of Myrtle Wilson and Sandi Stevens at the crime scene and also performed the autopsies on the victims. She determined that the victims died between 4:00 a.m. and 7:00 a.m. on December 22, 1997. Ms. Wilson died as a result of both manual strangulation and stab wounds to the chest. Although the stab wounds were "relatively superficial," they resulted in considerable loss of blood. Ms. Wilson also had defensive wounds to her hands. Dr. Ward stated that the knife which was in evidence was consistent with the wounds found on Ms. Wilson's body.

Dr. Ward testified that Sandi Stevens died as a result of ligature strangulation. She also said that Ms. Stevens had a "small, superficial tear in the skin on the back wall of the vagina." It was Dr. Ward's opinion that the tear occurred after death and was probably a result of moving the body for examination. While Dr. Ward agreed with defense counsel that the tear could possibly have occurred due to the insertion of an object in Ms. Stevens' vagina after death, it was Dr. Ward's professional opinion that she herself caused the tear when she moved the body.

During the Defendant's proof, Tony Smith testified that he met the Defendant while they were both incarcerated at the Criminal Justice Center. Mr. Smith stated that he was also "locked up" with Lane Locke while he was there. Mr. Locke told him that he (Locke) had a chance to get early parole if he could find out certain information on different people. Mr. Locke also said that he knew all about the Defendant's case and that he was once a police officer. On cross-examination, Mr. Smith said that his conversations with Mr. Locke took place after Mr. Locke had already reported what he knew about the Defendant's case to the authorities.

Jessie Haun Jr. testified that the Defendant worked for him two or three years putting skirting on mobile homes. He said that the Defendant would sometimes borrow money from him to buy presents for his wife, Sandi Stevens. While the Defendant was in jail, he asked Mr. Haun to send a money order to the jail made out to Charles Randle. According to Mr. Haun, the Defendant stated that Charles Randle "was gonna beat up on his head if he didn't give him some money."

Detective Patricia Goodman Shealy of the Metro Police Department testified that she worked in the area of adult sex crimes. She was called to the scene on December 22 because it was possibly a sex-related crime. When she arrived, she discovered that both victims were laying on a bed in different bedrooms. She remembered that they were nude and that the genitals were exposed on the younger victim. Detective Shealy testified she went to the hospital with Corey Milliken to do a rape suspect kit on Mr. Milliken. She said that the purpose of a rape kit is to obtain samples from a suspect to be sent off for comparison if the detective feels like it needs to be done. She did not know the results of any comparisons that might have been done in this case. Detective Shealy further stated that it is normal procedure for her to be brought in to assist homicide detectives when nude women are involved.

Officer Raymond Radar with the identification section of the Metro Police Department worked with Officer Brad Corcoran in processing the scene. Officer Radar took all of the photographs at the scene, and he identified many of the photographs for the jury. He was at the crime scene for thirteen hours.

Ronald Jones testified that he worked with the Defendant in the mobile home business. He also knew Sandi Stevens. According to Mr. Jones, the Defendant "thought the world of his wife," and he bought gifts for her. Mr. Jones never saw the two fight. Mr. Jones had met Myrtle Wilson a few times, and he stated that the Defendant occasionally took Ms. Wilson for walks around the trailer park. Mr. Jones had not seen them together in roughly six months prior to the murders.

Chris Hickman testified that he had known the Defendant for about nine and a half years, and he also knew Sandi Stevens. Ms. Stevens and her mother had purchased a mobile home, and he set it up for them. After Ms. Stevens met the Defendant, she and her mother sold that home. Mr. Hickman testified that he visited in the Stevens' home about once or twice a month to watch wrestling on TV. He last saw the Stevens around Thanksgiving of 1997. He said that Ms. Stevens appeared to be sick, and she spent most of the time in her room.

Linda Haun testified that she knew the Defendant through their work in the mobile home business. She met Sandi Stevens through the Defendant. She said that the Defendant bought gifts for Ms. Stevens, including jewelry and a white convertible. She testified that the Defendant and Ms. Stevens were "real loving" and "very happy," but she admitted that she did not socialize with them.

Bobbie Tarpen was the Defendant's next-door neighbor. She testified that she would visit with the Defendant and Ms. Stevens regularly. She never heard them arguing. She said that the Defendant would take care of Ms. Stevens, who had a bad back. He would also take Ms. Wilson to the doctor and to get her hair done. Ms. Tarpen said that she saw the Defendant the night of the murders, and he was very upset. She said, "[H]e was just lost."

Gregg McCrary, a former FBI agent, testified that he ran a consulting business called Behavioral Criminology International. While in the FBI, he received specialized training in violent crime, violent crime analysis, and crime scene analysis. He was part of the FBI's Behavioral Science Unit, where he investigated hundreds of murder cases a year. He testified that his primary responsibility was assisting law enforcement agencies with unusual, bizarre, or repetitive violent crimes. While he usually testified for the prosecution in court, this was the second time that Mr. McCrary had testified for the defense. Mr. McCrary was certified as an expert in the field of criminal investigative analysis.

Mr. McCrary testified that he was asked by the defense to conduct a criminal investigative analysis of the crime scene in this case, which involves analyzing the crime scene, studying the victims to determine what might have elevated their risk for becoming victims, looking at underlying forensic reports, and looking at how the crime was committed. For this case, he was given photographs and a videotape of the crime scene, as well as the medical examiner's report. He

testified that the crime scene was sloppy and in disarray. The crime scene showed a lack of control. There was a general trashing of the crime scene -- clothes were thrown down, purses and pills were dumped, things were scattered, the Christmas tree was knocked over -- all of which was unnecessary to commit the murders.

Mr. McCrary said that a "sex crime" is a crime of violence in which sex is used as a weapon or tool to punish, degrade and humiliate the victim. He explained that "staging" is the purposeful alteration of a crime scene by the offender done to refocus the investigation away from the offender. During staging, an offender attempts to hide the true motive and reality of the crime by attempting to make the crime scene look like one type of crime when, in fact, it is another. He also said that "transfer blood" is a stain or impression of blood which occurs when an offender with blood on him or her touches another object. It can be important because patterns may be evident in the blood transfer, which can be linked to specific garments or items. Mr. McCrary testified that fingerprints, footprints, and hair samples can be important evidence at a crime scene. In addition, Mr. McCrary stated that it was important to corroborate a confession with evidence from the crime scene.

Mr. McCrary testified that based on the crime scene, it is possible that there could have been more than one offender. First, different weapons were used to kill the victims: Ms. Wilson was stabbed, and Ms. Stevens suffered ligature strangulation. Second, there was not a lot of transfer blood in Ms. Stevens' room where you would expect it to be, such as on the pill bottles or the pornographic magazines which were on the bed. The items had to have been touched and placed on the bed by an offender, but they were totally free of blood transfers. In addition, the "staging" of the crime scene seemed to have been accomplished without transferring any blood to the items that were thrown about the trailer. Mr. McCrary testified that there was a feeble attempt at "staging" to make the scene look like a burglary. He said that burglars do not necessarily throw clothes and other items around.

Mr. McCrary was asked by defense counsel whether pornographic magazines "play into a sex crime." He responded that keeping in mind the motive of a sex crime is to punish, degrade, and humiliate the victim, "the displaying of the pornographic literature around . . . this victim -- uh -- in my opinion, [may] best be interpreted as an attempt to further humiliate or degrade . . . this victim. And, it goes to the -- goes to the motive of a sex crime."

FACTS--PENALTY PHASE

William Bowers, a Lieutenant with the Montgomery County Sheriff's Department, testified that in 1977, while he was an agent with the Tennessee Bureau of Investigation, he was the prosecuting witness in an investigation against the Defendant. On May 16, 1977, the Defendant was convicted of second degree murder in Clarksville, Tennessee.

Larry Wilson and Pat Chapman, Sandi Stevens' siblings and Myrtle Wilson's children, offered victim impact testimony as to the effect of the deaths of their sister and mother. Alisa Salvaggia, Sandi Stevens' daughter and Myrtle Wilson's granddaughter, also offered victim impact testimony.

-14-

Chris Baumann, the Defendant's sister, testified that they had a very normal family. There were five children, and they all had a good relationship. They would go on family vacations and do "family things," like swimming together. Ms. Baumann testified that the Defendant had a good relationship with his son, John, and that she never had any reason to fear the Defendant.

Roger Cooper, the sales manager of a mobile home company, testified that he hired the Defendant in 1989. He said that the Defendant was a hard worker. He had not seen the Defendant much since 1990.

Bobbie Tarpen, the Defendant's neighbor, testified that the Defendant was a good neighbor, and she will miss him a great deal. She said that the Defendant was always helping people, particularly an elderly woman who lived in the trailer park. She also testified that the Defendant had a good relationship with his son, and she never had any reason to fear the Defendant. She was aware that the Defendant had been in jail previously, but she did not know the reason.

David Westmoreland testified that he lived at the same trailer park as the Defendant, and the Defendant put the underpinning on his trailer without asking for payment. When he became disabled, the Defendant and Sandi Stevens both told him they would take care of him. The Defendant gave his son a job. He said he did not fear the Defendant.

Robert Rasmus testified that he is the Defendant's foster brother. Mr. Rasmus and his sister Chris are adopted, the Defendant is a foster child, and there are two natural siblings. All children were raised together equally; it was a good family upbringing. Mr. Rasmus said that their father is deceased and their mother is alive, but not in good health. While they were growing up, Mr. Rasmus and the Defendant shared a bedroom. They lost track of each other for a period of time, but they reunited about two years ago. At that time, Mr. Rasmus met Sandi Stevens. Mr. Rasmus said that the Defendant has a good relationship with his son, and he gives without regard to getting paid back. Mr. Rasmus expressed his belief that the Defendant could contribute to society while in prison. He was aware that the Defendant had been convicted of second degree murder and felony escape.

Vickie Stevens, the Defendant's ex-wife, testified that for most of their marriage, the Defendant was a good husband and father. She said that the Defendant and his son had a good relationship.

### 1. TESTIMONY OF GREGG MCCRARY

The Defendant argues that the trial court improperly limited the testimony of his crime scene expert, Gregg McCrary. He asserts that the trial court applied an incorrect legal standard and an unreasonable interpretation of Gregg McCrary's proffered testimony in finding the evidence inadmissible. He further asserts that the trial court's ruling effectively prevented the Defendant from putting on his defense. We find no error.

Questions concerning the qualifications, admissibility, relevancy, and competency of expert testimony are matters left within the discretion of the trial court. State v. Ballard, 855 S.W.2d 557,

562 (Tenn. 1993). On appeal, the standard of review is whether the trial court abused its discretion by admitting or excluding expert testimony. Id. "[A]n appellate court should find an abuse of discretion when it appears that a trial court applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining." State v. Shuck, 953 S.W.2d 662, 669 (Tenn. 1997). We are unable to conclude that the trial court applied an incorrect legal standard or reached a decision against logic or reasoning when it excluded the proposed testimony, thus we conclude that the trial court did not abuse its discretion.

During a jury-out offer of proof, Mr. McCrary testified that he was asked by the defense to conduct a crime scene analysis in which he would examine the evidence at the crime scene in order to determine the likely motive for the crime. He said that he specifically requested that he not be given any information regarding the suspect and that he was not engaging in criminal profiling, which is trying to determine the profile of an unknown suspect. Mr. McCrary described this crime scene as a "disorganized sexual homicide." He determined that Sandi Stevens was the primary target and was the focus of a sexual assault. He thought that Myrtle Wilson was simply a victim of opportunity who was in the wrong place at the wrong time. Mr. McCrary explained that in a disorganized homicide the victim and location are known to the offender, and there is minimal interpersonal contact between the victim and offender. He stated that usually a "blitz attack" or sudden violence is used. The crime scene is sloppy and in disarray. There is minimal use of restraints. Sexual acts tend to occur after death, and there is post-mortem injury to the victim and indications of post-mortem sexual activity. He stated that the body is left at the scene, typically in view, and a great deal of physical evidence is left at the scene. The murder weapon is usually a weapon of opportunity obtained at the scene. There is generally a precipitating stressor that triggers the violent event in a disorganized homicide, and the crime usually involves transferred aggression from the person or persons who precipitate the stressing event to the victim.

Mr. McCrary contrasted a disorganized crime scene to an organized crime scene, such as the typical "contract killing," which usually involves a victim and offender who are strangers. There is some interpersonal contact prior to the crime, such as a con or ruse to lure a victim out. In an organized crime scene, the scene reflects an overall sense of control; restraints are often seen; there are aggressive acts prior to the death; the body is usually hidden, though sometimes it is left propped up or displayed for shock value; the murder weapon is a weapon of choice brought to the scene and taken away after the crime; offenders are more "evidence conscious," and there is usually transportation of the body.

Mr. McCrary was asked whether a potential accuracy rate had been established, and he reported that the FBI had conducted one survey and determined that its agents were seventy-five to eighty percent accurate on crime scene analysis and profiling. He explained that this type of analysis is "not a hard science where you can do controlled experiments and come up with ratios in all this," but the increased demand for such services exemplifies its effectiveness. Mr. McCrary testified that there were seven agents in the FBI unit when he first entered the unit, there were twelve agents when he left the unit, and there are currently about forty agents in the unit. He said, "the proof . . . [that]

-16-

there is validation and reliability in the process is that it's being accepted. Uh -- it's being used and the demand is just outstripping our resources to provide it."

After hearing this offer of proof, the trial court disallowed the foregoing testimony, determining that it dealt with the "behavior aspect of an offender and not the crime scene." While commenting that Mr. McCrary and the other agents were no doubt "a tremendous asset as an investigative tool in law enforcement," the trial court found that testimony regarding the behavioral aspects of suspects would not comply with Tennessee Rule of Evidence 702 "in terms of substantially assisting the tr[ier] of fact because there is no trustworthiness or reliability." The trial court permitted Mr. McCrary to testify generally about the crime scene, the staging, the possibility that there were two offenders, and the things that should have been done by the police, but the trial court would not permit Mr. McCrary to testify as to what he believed to be the motive for the crime. In its order denying the Defendant's motion for a new trial, the trial court found the following:

Most of McCrary's proffered testimony dealt with conclusions he reached after analyzing the scene of the crime. For instance, he concluded that the manner in which various household items had been carefully moved, displayed, damaged, or destroyed indicated that the perpetrator had "staged", or altered, the scene in an effort to confuse the authorities. The Court found this type of testimony to be sufficiently reliable to present to the jury. However, McCrary's testimony regarding the perpetrator's motivation, although based in part on the physical evidence at the scene, appeared to be much more speculative.

During the jury-out hearing, McCrary conceded that, to his knowledge, no court in the United States has ever admitted expert testimony which relied upon criminal profiling. Typically, a criminal profile is developed at the request of authorities who seek information regarding the race, sex, employment status, etc., of an unknown perpetrator. Although this type of sophisticated speculation is undoubtedly very helpful to criminal investigators, it is not sufficiently reliable to provide the basis for an expert opinion in a criminal trial.

Likewise, although not technically considered "profiling", McCrary's attempt to analyze the "behavior of the offender based on all the forensic evidence" does not pass muster. Despite agreeing that human behavior is very complex and that there can be multiple motives for a homicide, McCrary intended to express an expert opinion that the killer in this case had not been hired to commit the murders but, instead, had committed a sexually motivated crime triggered by an upsetting event.

This Court does not doubt McCrary's assertion that his opinion is based upon years of research and experience. For that reason, the Court agrees that the opinion is not based entirely on speculation. However, the Court is not convinced that this type of analysis has been subjected to adequate objective testing, or that it is based upon longstanding, reliable, scientific principles. Consequently, after considering the proffered testimony, the relevant authorities, and the arguments of counsel, the Court

-17-

again concludes that this portion of McCrary's testimony would not have "substantially assist[ed] the trier of fact."

The Defendant now argues that the trial court erred by requiring that Mr. McCrary's testimony be "based upon longstanding, reliable, scientific principles" because the testimony was "specialized," rather than "scientific," and he argues that the trial court misconstrued the nature of Mr. McCrary's testimony in finding it inadmissible.

Opinion testimony by expert witnesses is governed by Tennessee Rules of Evidence 702 and 703. Rule 702 provides,

> If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise.

Rule 703 then provides,

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence. The court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness.

Tennessee Rule of Evidence 702 is more stringent than its federal counterpart, in that it requires the expert testimony to "substantially assist the trier of fact," while the federal rule requires only that the testimony "assist the trier of fact." See Tenn. R. Evid. 702 (emphasis added); Fed. R. Evid. 702 (emphasis added); see also State v. Coley, 32 S.W.3d 831, 834 (Tenn. 2000); McDaniel v. CSX Transp., Inc., 955 S.W.2d 257, 264 (Tenn. 1997). "This distinction indicates that the probative force of the testimony must be stronger before it is admitted in Tennessee." McDaniel, 955 S.W.2d at 264. Also, Tennessee Rule of Evidence 703 states that "[t]he court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness." There is no such restriction on expert testimony under the federal rule. See Fed. R. Evid. 703; McDaniel, 955 S.W.2d at 264-65.

In determining the reliability of expert scientific evidence, our supreme court has stated that a trial court may consider the following factors:

> (1) whether [the] scientific evidence has been tested and the methodology with which it has been tested; (2) whether the evidence has been subjected to peer review or publication; (3) whether a potential rate of error is known; (4) whether, as formerly required by Frye, the evidence is generally accepted in the scientific community; and (5) whether the expert's research in the field has been conducted independent of litigation.

-18-

McDaniel, 955 S.W.2d at 266. "The court . . . must assure itself that the opinions are based on relevant scientific methods, processes, and data, and not upon an expert's mere speculation." Id. While there is no Tennessee case specifically setting forth factors to consider in determining the reliability of "specialized" or "technical" evidence, as opposed to "scientific" evidence, we believe that the factors set forth in McDaniel may be relevant and applicable to "technical" or "specialized" evidence in a given case. See Kumho Tire Co., Ltd., v. Carmichael, 526 U.S. 137, 150 (1999) (holding, under the federal rules, that the established factors to consider in determining the reliability of scientific evidence "may or may not be pertinent in assessing reliability [of technical or other specialized evidence], depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony"). No matter what type of evidence is at issue, the evidence should be derived from "relevant . . . methods, processes, and data, and not upon an expert's mere speculation." See McDaniel, 955 S.W.2d at 265. According to Mr. McCrary, the system of analysis he used in analyzing this crime scene is not a "hard science," but it is based on methods, processes, and data developed by the FBI for the investigation of violent crime. Thus, we cannot say, as urged by the Defendant, that the trial court applied an incorrect legal standard by looking to McDaniel to determine the reliability of the evidence and by considering in its ruling the objective peer review of the methods and processes used and the principles, scientific or otherwise, on which the evidence was based.

The Defendant next argues that the trial court misconstrued the nature of Mr. McCrary's testimony. He argues that Mr. McCrary was prepared to testify about characteristics of a crime scene and what those characteristics indicate, which are matters not within the common understanding of the jury. He asserts that the testimony would have substantially assisted the jury in understanding the crime scene. In support of his argument, the Defendant relies on two cases from other jurisdictions in which similar testimony was permitted. See Clarence Leland Simmons v. State, CR-97-0768, 1999 WL 722688 at *4-13 (Ala. Crim. App. Apr. 28, 2000 (opinion after remand)); United States v. Meeks, 35 M.J. 64, 67 (C.M.A. 1992). In Clarence Leland Simmons, the Alabama Court of Criminal Appeals considered the defendant's challenge to the testimony of Thomas Neer, an agent for the FBI who worked in their profiling behavioral assessment unit. Simmons, 1999 WL 722688, at *5. According to Agent Neer, his analysis of the crime scene indicated that the homicide offense at issue was sexually motivated and that the person who committed the offense did so for sexual gratification. Id. The Alabama court distinguished Agent Neer's testimony from "profile" testimony, which it found to be of little probative value and extremely prejudicial to a defendant; it stated, "There is an enormous difference in testimony identifying a person who bears certain characteristics as being more likely to have committed the offense and in testimony that the physical evidence of a crime indicates certain characteristics about the offense." Id. After listing Neer's extensive experience in the field of crime scene analysis, the court "recognize[d] that through interviews, case studies, and research a person may acquire superior knowledge concerning characteristics of an offense." Id. at *10. It then determined that there had been adequate evidence presented to establish the reliability of crime scene analysis and victimology as fields of "specialized knowledge" and that the jury would be "greatly assisted by a professional analysis of the crime scene in comparison to other murder cases." Id. at 10-11.

Similarly, in Meeks, the United States Court of Military Appeals held that the testimony of FBI Agent Judson Ray was admissible in the defendant's trial for a double homicide. Meeks, 35 M.J. at 65. Agent Ray was permitted to testify that in his "professional opinion, . . . the person that was responsible went there with sex and killing on his mind." Id. at 66. In finding the testimony admissible, the court determined that Agent Ray had extensive experience and training in the field of crime scene analysis, stating, "This showing of expertise can hardly be considered speculation." Id. at 68. The court noted that a homicide and its crime scene are not matters likely to be within the knowledge of an average court-martial member and that Agent Ray's testimony would assist those members in understanding the evidence. Id. at 68-69.

While we find these cases instructive, we note that the evidence in both cases was admitted under rules of expert testimony identical to the federal rule, not the Tennessee rule, in that the rule required only that the evidence "assist the trier of fact." See id. at 67; Clarence Leland Simmons, 1999 WL 722688, at *6; Fed. R. Evid. 702. The probative force of the testimony must be stronger before it is admissible in Tennessee. See McDaniel, 955 S.W.2d at 264. Moreover, other courts have found similar testimony to be inadmissible under the less stringent standard of evidence that will "assist the trier of fact." See State v. Roquemore, 620 N.E.2d 110, 112-15 (Ohio Ct. App. 1993); State v. Lowe, 599 N.E.2d 783, 784-85 (Ohio Ct. App. 1991). For example, in Lowe, the Ohio Court of Appeals found the proposed testimony of FBI Agent John Douglas to be inadmissible. Id. at 785. Agent Douglas, who had been an FBI agent for twenty years, also had extensive experience in crime scene analysis. See id. at 784. Agent Douglas explained that criminal-investigative analysis is a process through which the crime scene is examined to determine the perpetrator's motivation for the crime. Id. He was prepared to testify that, based on his review of the crime scene materials, he believed that the motivation for the homicide was sexual. Id. After reviewing the proposed testimony, the court found that it was not sufficiently reliable to be admissible, stating, "[W]hile we in no way trivialize the importance of Douglas's work in the field of crime detection and criminal apprehension, we do not find that there was sufficient evidence of reliability adduced to demonstrate the relevancy of the testimony or to qualify Douglas as an expert witness." Id. at 785.

Applying Tennessee's more stringent requirement that expert testimony "substantially assist the trier of fact," we cannot find that the trial court abused its discretion by ruling that Mr. McCrary's testimony was not reliable enough to substantially assist the trier of fact in understanding the evidence or in determining a fact in issue. Tennessee courts have been hesitant to admit expert testimony dealing with behavioral characteristics of offenders or victims in order to prove that a certain crime did or did not occur as alleged. See Ballard, 855 S.W.2d at 561-62; State v. Ashburn, 914 S.W.2d 108, 111-12 (Tenn. Crim. App. 1995); State v. Campbell, 904 S.W.2d 608, 616 (Tenn. Crim. App. 1995); State v. Anderson, 880 S.W.2d 720, 729-30 (Tenn. Crim. App. 1995); State v. Schimpf, 782 S.W.2d 186, 193-94 (Tenn. Crim. App. 1989). For example, in Ballard, the supreme court found reversible error when the trial court permitted an expert witness to testify that the alleged victims of sexual abuse exhibited "symptom constellations" consistent with post-traumatic stress syndrome and that it was his opinion that the "'stressor' precipitating the syndrome in the children was sexual abuse." Id. at 561. The court held that "expert testimony describing the behavior of an

allegedly sexually abused child is not reliable enough to 'substantially assist' a jury in an inquiry of whether the crime of child sexual abuse has taken place." Ballard, 855 S.W.2d at 562. In so doing, the court warned,

> In the context of a criminal trial, expert scientific testimony solicits the danger of undue prejudice or confusing the issues or misleading the jury because of its aura of special reliability and trustworthiness. This "special aura" of expert scientific testimony, especially testimony concerning personality profiles of sexually abused children, may lead a jury to abandon its responsibility as fact finder and adopt the judgment of the expert. . . . Testimony that children exhibit symptoms or characteristics of post-traumatic stress syndrome should not suffice to confirm the fact of sexual abuse. The symptoms of the syndrome are "not like a fingerprint in that it can clearly identify the perpetrator of a crime." Expert testimony of this type invades the province of the jury to decide on the credibility of the witnesses.

Id. at 561-62 (citations omitted). The court further stated that a "behavioral profile that is sufficient for the purposes of psychological treatment between patient and doctor does not rise to the strict requirements necessary for admissibility in a criminal court of law." Id. at 562. Similarly, in Ashburn, this Court held that the trial court properly excluded expert testimony that the defendant suffered from post-traumatic stress disorder as a result of being the victim of a rape, which was offered to corroborate the testimony of the defendant that the victim raped him, rather than the opposite. Ashburn, 914 S.W.2d at 111-12. In addition, in Campbell, this Court held that the trial court did not abuse its discretion in ruling inadmissible testimony of a psychologist that the defendant did not have the "propensity" to commit crimes involving the sexual abuse of children. Campbell, 904 S.W.2d at 616.

We believe that the testimony at issue in this case is similar to that found inadmissible in the cases above. Contrary to the Defendant's assertions, Mr. McCrary was attempting to do more than merely explain the characteristics of a crime scene. His testimony offered an opinion on the psychological motives of the perpetrator, based solely on the evidence left at the crime scene. Mr. McCrary was prepared to testify that he could determine the motive of the perpetrator by comparing the crime scene at issue to "typical" crime scenes in which the motivation is a sexual assault brought about by a precipitating stressor. Thus, like in Ballard, Ashburn, and Campbell, the testimony was attempting to show that a crime did or did not occur as alleged based on the manner in which a person behaved. Moreover, Mr. McCrary himself testified that an internal FBI study determined the accuracy rate of crime scene analysis and criminal profiling to be seventy-five to eighty percent accurate. Considering the above cases, the seventy-five to eighty percent accuracy rate, and the "special aura" of expert testimony, we conclude that the trial court did not abuse its discretion by determining that the proposed expert testimony was not reliable enough to substantially assist the trier of fact.

Finally, the Defendant asserts that the trial court's exclusion of Mr. McCrary's testimony effectively prevented him from putting on a defense. A defendant's right to present a defense, which includes the right to present witnesses favorable to the defense, is guaranteed by the Sixth

Amendment to the United States Constitution and the Due Process Clause of the Fourteenth Amendment to the Unites States Constitution. See U.S. Const. amend. VI, XIV; Chambers v. Mississippi, 410 U.S. 284, 294-95, 302 (1973); State v. Brown, 29 S.W.3d 427, 432 (Tenn. 2000). "In the exercise of this right, the accused, as is required of the State, must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." Chambers, 410 U.S. at 302. "However, these procedural and evidentiary rules of exclusion 'may not be applied mechanistically to defeat the ends of justice.'" Brown, 29 S.W.3d at 432 (quoting Chambers, 410 U.S. at 302). Our supreme court has maintained,

> The facts of each case must be considered carefully to determine whether the constitutional right to present a defense has been violated by the exclusion of the evidence. Generally, the analysis should consider whether: (1) the excluded evidence is critical to the defense; (2) the evidence bears sufficient indicia of reliability; and (3) the interest supporting exclusion of the evidence is substantially important.

Id. at 433-34.

Looking at the facts of this case, we conclude that the Defendant was not denied the right to present a defense. First, we disagree with the Defendant that Mr. McCrary's testimony was the "linchpin of the defendant's case." While the admission of the testimony would have obviously strengthened the Defendant's theory of the case, it was not essential to the defense. The Defendant's theory was that Mr. Milliken committed the murders because he was sexually infatuated with Sandi Stevens, rather than because the Defendant hired him to do it. While we do not believe that the State's and the Defendant's theories were mutually exclusive, we agree with the Defendant that evidence that Mr. Milliken killed the victims because he was sexually infatuated with Sandi Stevens would have made it somewhat less likely that he killed them because he was hired by the Defendant. However, we believe that the jury could have drawn that conclusion from the facts of the crime scene, without the opinions of Mr. McCrary. Virtually every officer who testified described how the victims were found. They admitted that they thought it might have been a sex crime. Moreover, although he had been told not to express such an opinion, Mr. McCrary did testify that "the displaying of the pornographic literature around . . . this victim -- uh -- in my opinion, [may] best be interpreted as an attempt to further humiliate or degrade . . . this victim. And, it goes to the -- goes to the motive of a sex crime." Thus, Mr. McCrary's opinion that this was a sex crime was presented to the jury, albeit not to the extent that the Defendant wished.

Further, as already determined, the expert testimony did not bear sufficient indicia of reliability to substantially assist the trier of fact. While the type of crime scene analysis performed by Mr. McCrary is undoubtedly an asset to criminal investigations, it is only seventy-five to eighty percent accurate according to an internal FBI study. Considering the importance a jury places on expert testimony and the need to place only reliable evidence before a jury so as to ensure accurate fact-finding, see Ballard, 855 S.W.2d at 561-62; Chambers, 410 U.S. at 302, this testimony was properly excluded.

## 2. TESTIMONY REGARDING INDEPENDENT MOTIVE

Next, the Defendant claims that the trial court erred by excluding the proffered testimony of Barry Morris, Corey Milliken's former foster parent. He asserts that Mr. Morris' testimony would have shown that Corey Milliken had an independent motive to commit the murders. The Defendant further asserts that he was prohibited from presenting a complete defense because of the exclusion. We disagree.

During a jury-out offer of proof, Barry Morris testified that Corey Milliken resided with him and his ex-wife for a little over a year until late 1996. Mr. Morris told the court that when Mr. Milliken would talk to his mother on the telephone, he would become upset and angry, and he would be violent for two or three hours after the phone call. Sometimes Mr. Milliken would be angry and upset for a couple of days after the telephone call. Mr. Morris clarified that by "violent" he meant Mr. Milliken would be violent towards property, not persons. On several occasions, Mr. Milliken would take a knife and cut holes in the chairs. Mr. Milliken never assaulted anyone. Mr. Morris testified that Mr. Milliken was very "moody," and if things started getting difficult for Mr. Milliken, "he could get pretty much out of hand." Mr. Morris did not find Mr. Milliken to be a truthful person. Once, Mr. Milliken told Mr. Morris that he "needed to be careful when [he] went to sleep," but Mr. Morris did not take the threat seriously. At times, Mr. Morris would have up to four foster children in his home at the same time, and they all behaved in ways similar to Mr. Milliken.

The Defendant contends that Corey Milliken murdered the victims because he was sexually obsessed with Sandi Stevens; that Ms. Stevens had repeatedly rejected Mr. Milliken and did not want him in her home; and that on the evening before the murders, Mr. Milliken had a fight with his mother and step-father which provoked an emotional reaction, resulting in the sexual assault and murders of the victims. The Defendant asserts that he needed the proffered testimony to help establish his defense theory. At trial, the Defendant asserted that the proffered testimony was admissible to show Corey Milliken's "[i]ntent when he gets mad at his mother. . . . And, he becomes violent after that." On appeal, he asserts that the proffered testimony would have shown that Mr. Milliken had an independent motive to commit the murders by establishing that Mr. Milliken was emotionally unstable; that he would act out in a violent manner, especially after confrontations with his mother; that he used a knife to express his anger; and that he threatened harm to another person.

The trial court excluded the proffered testimony on the basis of Tennessee Rule of Evidence 404(b), which provides,

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:
>
> (1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence; and

(3) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Often such evidence is admitted as proof of motive, intent, identity, absence of mistake or accident, or common scheme or plan. See State v. Parton, 694 S.W.2d 299, 302 (Tenn. 1985); Bunch v. State, 605 S.W.2d 227, 229 (Tenn. 1980). During a hearing outside the jury's presence, the trial court listened to the proffered testimony and determined that the testimony was not relevant to a material issue other than conduct conforming with a character trait. It stated, "[T]he purpose of what you're offering this for is apparent to the Court; that is, to show propensity that he's violent after arguments with his parents, which is exactly what 404 prohibits."

When reviewing a trial court's decision to admit or exclude evidence based on its evidentiary relevance, we will not reverse that decision absent an abuse of discretion. State v. Gilliland, 22 S.W.3d 266, 270 (Tenn. 2000); State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997). Likewise, when the trial court has substantially complied with the procedures mandated by Tennessee Rule of Evidence 404(b) in determining the admissibility of evidence under that rule, any decision as to whether to admit or exclude evidence under Rule 404(b) will be reversed only for an abuse of discretion. Id. We are unable to find an abuse of discretion in this case.

The Defendant correctly asserts that he has a right to prove that another person had a motive to commit the offense with which he is charged. See Sawyers v. State, 83 Tenn. 694, 695 (1885); State v. Spurlock, 874 S.W.2d 602, 612 (Tenn. Crim. App. 1993); State v. McAlister, 751 S.W.2d 436, 439 (Tenn. Crim. App. 1987). However, we do not believe that Corey Milliken's actions while he was staying with Barry Morris are relevant to his motive for committing the murders of Sandi Stevens and Myrtle Wilson. Relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Evidence which is not relevant is inadmissible. Tenn. R. Evid. 402. Contrary to the Defendant's assertions, we do not see how testimony that in 1995 and 1996, Corey Milliken, like other foster children, would be moody and difficult and would damage property with a knife because he was angry and upset after telephone conversations with his mother makes it more probable that on December 22, 1997, Mr. Milliken murdered Sandi Stevens and Myrtle Wilson because he was upset with his mother and step-father. Any connection between the events in 1995 and 1996 and the murders in 1997 is simply too tenuous. Thus, we conclude that the trial court did not err by finding that the proffered testimony was irrelevant to a material fact in issue.

Moreover, the Defendant is confusing motive with propensity. See Parton, 694 S.W.2d at 303. While speculative, the Defendant is attempting to show that on December 22, 1997, Corey Milliken was acting in conformity with his character trait of being upset and violent after

-24-

confrontations with his mother. The trial court found this to be the type of propensity evidence prohibited by Rule 404(b), and we cannot find that determination to be an abuse of discretion.

### 3. REDACTED VERSION OF SANDI STEVENS' DIARY

The Defendant argues that the trial court erred by admitting a redacted version of Sandi Stevens' diary. The diary was admitted pursuant to Tennessee Rule of Evidence 803(3), which provides a hearsay exception for statements of a declarant's "then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health)." In the diary, Sandi Stevens made statements concerning her unhappiness with her marriage and her life. She was upset about the physical and mental effects of menopause and the Defendant's lack of understanding of her condition. She made references to multiple arguments that she and the Defendant had, and she stated that she was considering leaving the marriage. The trial court admitted the diary to rebut the Defendant's statements that there were no problems in their marriage. On appeal, the Defendant does not argue that the statements made in the diary do not fall within the "state of mind" exception to the hearsay rule, but instead asserts that the diary was not relevant, and even if the diary was relevant, its probative value was substantially outweighed by the danger of unfair prejudice. He also contends that the diary was cumulative of other testimony concerning the Defendant's marriage to Ms. Stevens.

A trial court's decision to admit evidence based on its relevance will not be reversed absent an abuse of discretion in admitting the evidence. Gilliland, 22 S.W.3d at 270. As previously stated, relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Our supreme court has previously held that statements made by a victim expressing her fear of the defendant during the period of their separation were relevant to rebut the defendant's assertions that he and the victim were reconciling. See State v. Smith, 868 S.W.2d 561, 573 (Tenn. 1993). Similarly, this Court has found that a victim's statements that her husband had abused her and threatened to kill her were relevant to rebut the defendant's assertion in opening statement that he and the victim "had a good marriage and a happy marriage." See State v. John Parker Roe, No. 02C01-9702-CR-00054, 1998 WL 7107, at *10 (Tenn. Crim. App., Jackson, Jan. 12, 1998) perm. app. denied (Tenn. Jan. 4, 1999).

The status of the Defendant's relationship with Sandi Stevens became an issue in this case when Shawn Austin testified that the Defendant wanted to kill his wife and mother-in-law so that he would no longer have to pay their bills and listen to their complaints and because it would be easier to kill them than go through another divorce. Then, in the statement he gave to the police, the Defendant claimed that he cared "very deeply about [his] mother in law" and that he "love[d] [his] wife." He asserted that he and Ms. Stevens did not have any problems in their marriage. Although he said that Ms. Stevens was always jealous and that she thought he cheated on her, the Defendant maintained, "It's always been that way," and he asserted that it was not a problem in their marriage. Thus, we agree with the trial court that Sandi Stevens' statements concerning fights she had with the Defendant, unhappiness with her marriage, and thoughts of leaving the Defendant were relevant to rebut the Defendant's assertion that there were no problems in their marriage.

Next, the Defendant asserts that the probative value of the diary was outweighed by the danger of unfair prejudice. Under our Rules of Evidence, even relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. While we agree with the Defendant that Ms. Stevens' emotional statements concerning her life and the problems in her marriage were prejudicial to the Defendant, we do not believe that they were unfairly prejudicial. The Defendant claimed that there were no problems in the marriage, making Ms. Stevens' own statements about the marriage the most probative evidence available to rebut the Defendant's claims. Moreover, we cannot agree that the diary should have been excluded because it was cumulative to other testimony concerning the status of the Defendant's marriage. The State had the burden of proving beyond a reasonable doubt that the Defendant was criminally responsible for the murders of Sandi Stevens and Myrtle Wilson, and the diary was the best evidence available to the State to show that there were problems in the marriage, supporting the State's theory of motive. In essence, the probative value of the diary was not substantially outweighed by the danger of unfair prejudice.

Finally, the Defendant argues that the trial court should have admitted the entire diary rather than admitting a redacted version, so that the jury could get a complete picture of Sandi Stevens' emotional state. At trial, when the trial court indicated that it would admit portions of the diary but redact the portions it found to be irrelevant or prejudicial, the Defendant requested that the entire diary be admitted into evidence. The parties then went through various discussions about what would and would not be admitted, and the trial court ultimately admitted a partially redacted version. After looking at the redacted portions of the diary, we cannot say that the trial court abused its discretion by redacting the diary. The redacted portions concerned statements about the Defendant being "different" from the rest of society, statements about the Defendant lying to Ms. Stevens and flirting with other women, statements about Ms. Stevens' negative view of men in general, and statements about Ms. Stevens' negative feelings about herself. We agree with the court that these statements were either irrelevant or prejudicial to the Defendant.

However, it does appear that the trial court inadvertently redacted a portion of the diary concerning Ms. Stevens' feelings toward Corey Milliken. At the request of the Defendant, the trial court admitted portions of the diary containing statements of Ms. Stevens' dislike of Corey Milliken and of the fights she had with the Defendant about Mr. Milliken. Although it is unclear from the record what actually transpired, it appears that the trial court intended to admit all the statements regarding Corey Milliken, but the following statement was omitted:

And the way he (Cory) glares at me! Such hatred! He's such a sick, troubled 18 yr. old! I once tried to understand him & help him as Bill is doing but eventually gave up simply because he doesn't want to be helped. Doesn't want to make the effort because that takes <u>work</u>! Constantly skips school. Last week dropped out! I <u>can't</u> tolerate him anymore!

Notwithstanding, we conclude that the omission of this statement, if error, was harmless. The trial court did admit the following excerpt of Ms. Stevens' diary, which depicts her feelings toward Mr. Milliken:

> Had a big fight late last night about Cory again! Bill continues to stick up for him & I continue to dislike him more every day! I'm seriously considering leaving. Things have gotten so bad it seems Bill & I argue about him constantly. I can see a time coming when the wedge he's (Cory) driven between us will tear us apart. Cory Milliken is bad news! I'm sure he would be quite happy to move in if he can get me out. He's such a prick. No one in this world stupider or more untrustworthy! He's proven that time & time again.

An error will not be grounds for reversal unless it affirmatively appears to have affected the result of the trial on the merits. See Tenn. R. Crim. P. 52(a); Tenn. R. App. P. 36(b). In light of the other evidence concerning the relationship between Corey Milliken and Sandi Stevens, we cannot say that this omission would have affected the result of the trial on the merits.

#### 4. RULINGS ON HEARSAY AND OTHER EVIDENTIARY MATTERS

The Defendant argues that the trial court sustained the State's hearsay and relevancy objections and overruled defense hearsay and relevancy objections in a less-than-evenhanded manner, thus denying the Defendant a fair opportunity to present his case. He asserts that the cumulative effect of the one-sided rulings violated his constitutional right to present a complete defense and his right to reliable fact-finding in both the guilt and sentencing determinations. The State counters with the argument that the Defendant waived this issue because he did not include it in his motion for a new trial. The State is correct in that the Defendant did not argue in his motion that the cumulative effect of one-sided evidentiary rulings deprived him of a fair trial, but he did argue that most of the individual evidentiary rulings were error. Accordingly, we conclude that the Defendant has not waived this issue, and we will consider his argument on appeal. See Tenn. R. App. P. 3(e).

The Defendant points to six instances in which he alleges the evidentiary rulings were biased towards the State. First, he states that Doris Trott, Ms. Wilson's hairdresser, was permitted to testify over defense objection that Ms. Wilson said she was not going to loan the Defendant any more money. Ms. Trott was also permitted to testify that Ms. Wilson said she had refused to sign insurance papers the Defendant had given her for a $10,000.00 life insurance policy. The Defendant asserts that these statements were admitted under the "then existing state of mind" hearsay exception; yet, when the defense asked Ms. Trott whether Ms. Wilson had ever told her that she was concerned about Corey Milliken, which was similar "state of mind" testimony, the trial court sustained the State's hearsay objection. We disagree with the Defendant's assessment of these evidentiary rulings. Ms. Trott was asked whether she overheard a conversation between the Defendant and Ms. Wilson, and she answered that she did not hear all of the conversation, but they were talking about money. At this point the Defendant objected, stating that if she did not hear all of the conversation, she should not be able to testify about what was said. The trial court overruled the objection because Ms. Trott had already answered the question. The State then asked Ms. Trott about the statements Ms.

Wilson made to her about loaning the Defendant money and about the life insurance policy. The Defendant made no objection to these hearsay statements. Then, on cross-examination, the Defendant attempted to elicit hearsay statements from Ms. Trott about things Ms. Wilson said concerning Corey Milliken, and the State objected. During a bench conference, the trial court gave the Defendant the opportunity to offer a hearsay exception for the statements, but the Defendant argued, "it's a hearsay exception cause it shows the intent of Corey Milliken when he went in there -- uh -- was to rape these women." The trial court sustained the objection because the testimony did not fall under an exception to the hearsay rule. We agree with the trial court that the Defendant's stated "hearsay exception" is not an exception to the hearsay rule. See Tenn. R. Evid. 803. While the statements might have been admissible under the "then existing state of mind" hearsay exception, see Tenn. R. Evid. 803(3), the Defendant did not assert that exception as a way of admitting the evidence. Thus, we cannot agree with the Defendant that the ruling was one-sided; he did not object to the State's hearsay evidence, and he did not offer an appropriate hearsay exception for his evidence. Moreover, we do not believe that the exclusion of the testimony, if erroneously excluded, would have affected the result of the trial on the merits. See Tenn. R. Crim. P. 52(a); Tenn. R. App. P. 36(b).

The Defendant asserts that the trial court was acting one-sided when it sustained the State's objection to the Defendant's questioning of Shawn Austin regarding whether Corey Milliken had been kicked out of the Stevens' home because of sexual comments that he had made, but then permitted the State to elicit triple hearsay from Shawn Austin about whether Mr. Milliken had told him that the Defendant had told Mr. Milliken that Sandi Stevens wanted to have sex with both the Defendant and Mr. Milliken. Mr. Austin was permitted to testify that Mr. Milliken had been kicked out of the Stevens' home, but when the Defendant asked whether that was because of sexual comments Mr. Milliken had made, the State objected on hearsay grounds. The trial court sustained that objection. Later, the Defendant asked Mr. Austin whether Corey Milliken was infatuated with Ms. Stevens, and Mr. Austin said that Corey Milliken was sexually infatuated with Ms. Stevens and that he wanted to have sex with her. The State then asked Mr. Austin whether Mr. Milliken had ever told him about conversations Mr. Milliken had had with the Defendant about Ms. Stevens, and the Defendant objected on hearsay grounds. During a bench conference, the State indicated it was asking about statements the Defendant made to Corey Milliken stating that Ms. Stevens wanted to have sex with the Defendant and Corey Milliken at the same time; the State asserted that these statements were admissible as statements made in furtherance of the conspiracy. Defense counsel responded, "I'm sorry," and seemed to indicate that he had misunderstood what the State was asking. He made no further arguments that the testimony was inadmissible, and the trial court overruled the objection. In its order overruling the motion for a new trial, the trial court stated that this testimony was admissible as a statement made in furtherance of the conspiracy because it went towards the Defendant's purpose of building trust and confidence with Corey Milliken.

If offered to prove the truth of the statements, this testimony would no doubt call for hearsay within hearsay. See Tenn. R. Evid. 801(c). For such hearsay testimony to be admissible, each part of the combined statements must conform to a hearsay exception. Tenn. R. Evid. 805. However, none of the combined statements were offered to prove that Ms. Stevens wanted to have sex with

both the Defendant and Mr. Milliken at the same time. As the State asserted, they were offered to show the Defendant's attempts to build trust and confidence in Mr. Milliken. In addition, from the Defendant's perspective, the statements would support the defense theory that Mr. Milliken murdered the victims because he was sexually obsessed with Sandi Stevens. Thus, because the statements were not offered to prove the truth of the statements, they were not hearsay and were therefore admissible. See Tenn. R. Evid. 801(c).

During cross-examination of Shawn Austin, the Defendant asked Mr. Austin whether Mr. Milliken lied to make himself a "bigger man." Mr. Austin answered, "yeah," and the State objected on relevancy grounds. The Defendant asserts that the trial court erred by sustaining the State's objection. While the trial court did sustain the objection, it did not instruct the jury to disregard Mr. Austin's answer to the question. It simply told defense counsel to "move on." Thus, the trial court did not exclude the testimony. We find no error.

Next, the Defendant complains because Sarah Suttle was permitted to testify on direct examination to virtually everything Mr. Milliken told her about the crime, but when defense counsel asked if Mr. Milliken had told her that he had been kicked out of the Stevens home twice or that he sexually assaulted the victims, the trial court sustained the State's hearsay objections. However, as will be addressed more thoroughly below, the Defendant made no objections to Sarah Suttle's testimony on direct examination regarding what Mr. Milliken had told her. He cannot assert that the trial court's ruling was one-sided when the court had no objection on which to rule regarding the witness's direct examination. Moreover, before the State objected, Ms. Suttle answered "no" to the Defendant's question about whether Mr. Milliken had told her that he sexually assaulted the victims. Thus, the only question she was not permitted to answer was whether Mr. Milliken had told her that he had been kicked out of the Stevens' home twice. What Mr. Milliken said out of court was offered to prove the truth of the statements, so it was clearly hearsay. See Tenn. R. Evid. 801. The Defendant offered no hearsay exception for the statements. Accordingly, we find no error.

During cross-examination of Det. Postiglione, the detective was asked if in the course of his investigation he determined whether Ms. Stevens ever had any arguments or disputes with anyone. The State objected on hearsay grounds. The Defendant rephrased the question, and Det. Postiglione answered that he did determine that Ms. Stevens had disputes with someone. When the Defendant asked whether that person was Corey Milliken, the State again objected. This time, the trial court sustained the objection. We find no error with this ruling. The Defendant was attempting to obtain hearsay testimony that Mr. Milliken and Ms. Stevens had disputes. The Defendant did not offer a hearsay exception for the testimony, and we cannot find one which would be applicable; thus, it was properly excluded.

Finally, the Defendant asserts that the trial court impeded his cross-examination of Det. Gray regarding the basis for his confidence in the accuracy of Mr. Milliken's statement. The Defendant vigorously cross-examined Det. Gray about his investigation of the case and extensively questioned Det. Gray about why he did not do certain things in the investigation, like send the telephone cord with blood on it off for DNA testing or send the blood found in Ms. Wilson's bedroom off for

-29-

testing. Det. Gray maintained that he did not need to do these things because he knew who killed the victims based on Mr. Milliken's statement. The Defendant asserts that he should have been able to explore whether the statements made by Mr. Milliken were consistent or inconsistent with the crime scene. While some of the things Mr. Milliken said in his statement to police were brought out during questioning of Det. Gray, others were excluded when the State objected on hearsay grounds. Several other State objections were sustained on the basis of hearsay as well. We find no error in these rulings. The Defendant did not offer a hearsay objection which would have made the testimony admissible.

Based on our review of these evidentiary rulings, we conclude that the trial court did not issue one-sided rulings. Moreover, any error made in the rulings was harmless. Thus, this issue has no merit.

### 5. COREY MILLIKEN'S STATEMENTS TO SARAH SUTTLE

Next, the Defendant claims that the trial court erred by failing to exclude the statements Corey Milliken made to his girlfriend, Sarah Suttle, because those statements failed to qualify as statements of a co-conspirator, which would have been excepted from the hearsay rule. See Tenn. R. Evid. 803(1.2). Specifically, the Defendant asserts that those statements were made in "casual conversation" and thus did nothing to further the alleged conspiracy in any way.

The Defendant correctly asserts that Sarah Suttle was permitted to testify in detail to the statements made by Corey Milliken regarding the murders. However, the Defendant made no objection to the testimony at trial. In fact, prior to calling Sarah Suttle as a witness, the State informed the trial court that it intended to question Ms. Suttle about statements made by Mr. Milliken in furtherance of the conspiracy. At that time, the Defendant stated that he had no objection to the testimony, as evidenced by the following colloquy:

> MR. GIBSON [Defense counsel]: I'm not trying to keep out Shawn Austin's and Sara Suttle's testimony anyway. I –
> GENERAL THURMAN [Prosecutor]: If they don't have any objection, then that's fine. . . .
> THE COURT: Well, I mean, the issue, Mr. Gibson, is [--] General Thurman is attempting to forewarn, or bring up so we won't have to take so many breaks is, are you saying you're not opposed to their testimony; but, if their testimony [--] are you saying that if their testimony consists of statements made by Corey Milliken about this alleged plan, then you're not opposed to that?
> MR. GIBSON: No, Your Honor, I'm not.

At no point during Ms. Suttle's testimony did the Defendant object to any hearsay statements made by Corey Milliken.

In State v. Smith, 24 S.W.3d 274 (Tenn. 2000), our supreme court stated, "When a party does not object to the admissibility of evidence, . . . the evidence becomes admissible notwithstanding any other Rule of Evidence to the contrary, and the jury may consider that evidence for its 'natural probative effects as if it were in law admissible.'" Id. at 280 (quoting State v. Harrington, 627

S.W.2d 345, 348 (Tenn. 1981)). Moreover, when a party decides to forgo objection to the admissibility of evidence as a deliberate, tactical decision, this Court may not even consider whether the admission of the evidence was plain error. See id. at 283-84. Here, when the State informed the Defendant and the court that hearsay statements of Corey Milliken would be introduced, the Defendant indicated that he had no objection to that testimony. Accordingly, we find that he has waived consideration of whether the statements were admissible as an exception to the hearsay rule by failing to object to the statements at trial. See id. at 280; Tenn. R. App. P. 36(a).

## 6. CUMULATIVE EFFECT OF ERRORS

The Defendant asserts that if the individual errors were harmless standing by themselves, the cumulative effect of the errors denied him a fair trial. He argues that the trial court's rulings improperly limited defense efforts to establish that Corey Milliken had an independent motive for committing the murders. Having found that the trial court did not prevent the Defendant from presenting a complete defense by making erroneous evidentiary rulings, we likewise find that this issue has no merit.

## 7. INSTRUCTING JURY THAT IT MUST UNANIMOUSLY AGREE

The Defendant asserts that the trial court erred by instructing the jury that it must unanimously agree that the aggravating circumstances do not outweigh the mitigating circumstances in order to impose a life sentence, while prohibiting an instruction on the effect of a non-unanimous verdict. The trial court's instruction followed the mandates of Tennessee Code Annotated section 39-13-204(f)(1) and (h), but the Defendant argues that the statute violates the Eighth and Fourteenth Amendments to the United States Constitution in that it is misleading and coercive and it causes the jury to arbitrarily arrive at a unanimous verdict in order to avoid the imagined adverse consequences of a failure to agree on punishment.

This argument has been previously rejected by our supreme court. See State v. Vann, 976 S.W.2d 93, 118 (Tenn. 1998); State v. Smith, 893 S.W.2d 908, 926 (Tenn. 1994). Thus, we find no error.

## 8. APPLICATION OF AGGRAVATING CIRCUMSTANCE

The Defendant next argues that the application of the Tennessee Code Annotated section 39-13-204(i)(4) aggravating circumstance to his case duplicates an element of the underlying offense and thus fails to fulfill its constitutionally required function of narrowing the class of death eligible defendants. The Defendant was convicted of first degree murder based upon his criminal responsibility for the conduct of Corey Milliken. The statute defining criminal responsibility provides, in pertinent part:

A person is criminally responsible for an offense committed by the conduct of another if:

. . .

(2) Acting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]

Tenn. Code Ann. § 39-11-402. One of the aggravating factors found to be applicable to the Defendant then provides:

> The defendant committed the murder for remuneration or the promise of remuneration or employed another to commit the murder for remuneration or the promise of remuneration[.]

Id. § 39-13-204(i)(4). The Defendant thus argues that he was unlawfully convicted of first degree murder and sentenced to death based upon the same element: soliciting another to commit the act.

In Zant v. Stephens, 462 U.S. 862 (1983), the United States Supreme Court stated that in order to comply with the Eighth Amendment to the Constitution, aggravating circumstances must "genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." Id. at 877. Our supreme court has maintained that "[a] proper narrowing device, therefore, provides a principled way to distinguish the case in which the death penalty was imposed from the many cases in which it was not." State v. Middlebrooks, 840 S.W.2d 317, 343 (Tenn. 1992). In Middlebrooks, a majority of our supreme court held that when a defendant is convicted of first degree felony murder, application of the felony murder aggravating factor to the felony murder offense provides no narrowing of death-eligible defendants because the aggravating factor duplicates the elements of the offense. Id. at 346. However, our supreme court has also examined the situation at issue in this case, and it held that the "aggravating circumstance -- [that] the defendant employed another to commit the murder for remuneration or the promise of remuneration -- does not duplicate the elements of the offense [of first-degree murder], even incorporating the criminal responsibility statutes." State v. Stephenson, 878 S.W.2d 530, 557 (Tenn. 1994). The court concluded,

> Constitutional narrowing is accomplished because at the sentencing hearing, the State was required to prove that this defendant hired someone to kill his wife, or promised to pay someone to kill his wife. Obviously, not every defendant who is guilty of first-degree murder pursuant to the criminal responsibility statutes has also hired another or promised to pay another to commit the murder. Thus, the aggravating circumstance found by the jury in this case narrows the class of death-eligible defendants as required by State v. Middlebrooks.

Id. Accordingly, we conclude that the aggravating circumstance was properly applied to the Defendant in this case.

### 9. PROPORTIONALITY REVIEW

The Defendant next takes issue with our system of proportionality review. Pursuant to Tennessee Code Annotated section 39-13-206(c)(1)(D), a court reviewing a sentence of death must determine whether the "sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant." "[T]he purposes of comparative proportionality review are to eliminate the possibility that a person will be sentenced to death by the action of an aberrant jury and to guard against the capricious or random imposition of the death penalty." State v. Bland, 958 S.W.2d 651, 665 (Tenn. 1997).

Comparative proportionality review begins with the presumption that the sentence of death is appropriate for the crime of first degree murder. See State v. Hall, 958 S.W.2d 679, 699 (Tenn. 1997). However, a death sentence is disproportionate punishment if "the case, taken as a whole, is plainly lacking in circumstances consistent with those in similar cases in which the death penalty has been imposed." Bland, 958 S.W.2d at 665. This does not mean that a sentence of death is disproportionate merely because the circumstances of the offense are similar to those of another offense for which the death penalty was not imposed. See State v. Henderson, 24 S.W.3d 307, 315 (Tenn. 2000). "'[T]he isolated decision of a jury to afford mercy does not render unconstitutional death sentences imposed on defendants who were sentenced under a system that does not create a substantial risk of arbitrariness or caprice.'" Hall, 958 S.W.2d at 699 (quoting Gregg v. Georgia, 428 U.S. 153, 203 (1976)). Rather, our duty "is to assure that no aberrant death sentence is affirmed." Bland, 958 S.W.2d at 665.

Comparative proportionality review is not a rigid, objective test; appellate courts do not apply mathematical or scientific techniques in determining whether a sentence of death is proportional. Id. at 668; Hall, 958 S.W.2d at 699. Instead, after identifying a pool of similar cases in which a capital sentencing hearing was actually conducted, we consider a multitude of variables and also rely upon the experienced judgment and intuition of the members of this Court. Id. Factors relevant to the process of identification and comparison of similar cases include:

> (1) the means of death; (2) the manner of death (e.g., violent, torturous, etc.); (3) the motivation for the killing; (4) the place of death; (5) the similarity of the victims' circumstances including age, physical and mental conditions, and the victims' treatment during the killing; (6) the absence or presence of premeditation; (7) the absence or presence of provocation; (8) the absence or presence of justification; and (9) the injury to and the effects on nondecedent victims.

Bland, 958 S.W.2d at 667. In addition, factors relevant to a comparison of the characteristics of defendants include:

> (1) the defendant's prior criminal record or prior criminal activity; (2) the defendant's age, race, and gender; (3) the defendant's mental, emotional or physical condition; (4) the defendant's cooperation with authorities; (6) the defendant's remorse; (7) the defendant's knowledge of helplessness of victim(s); [and] (8) the defendant's capacity for rehabilitation.

Id.

The Defendant argues that this system of proportionality review deprives capital defendants of a liberty interest protected by the Due Process Clause of the Fourteenth Amendment because of the failure to promulgate meaningful standards of review. While recognizing that our supreme court published criteria for assessing whether a death sentence is disproportionate punishment in Bland, the Defendant argues that the standards are meaningless because no death sentence can ever be "plainly lacking in circumstances" similar to other death sentences because aggravating factors must be found in each case in order impose a sentence of death. He asserts that it is extremely unlikely

that any case will ever be held to be disproportionate under the <u>Bland</u> analysis. However, this Court, in <u>State v. Bobby G. Godsey</u>, No. E1997-00207-CCA-R3-DD, 2000 WL 1337655 (Tenn. Crim. App., Knoxville, Sept. 18, 2000), <u>perm. app. granted</u>, (Tenn. Mar. 12, 2001), did just that. In <u>Godsey</u>, the defendant was convicted of first degree murder during the perpetration of aggravated child abuse. <u>See</u> <u>id.</u> at \*1. The aggravating factor was that the murder was committed against a person less than twelve years of age. <u>See</u> <u>id.</u>; Tenn. Code Ann. § 39-13-204(i)(1). Following <u>Bland</u>, this Court found the sentence of death to be disproportionate after comparing the circumstances of the crime and the defendant to similar cases. <u>See</u> <u>Godsey</u>, 2000 WL 1337655, at \*19-27. The defendant's sentence was therefore modified to life imprisonment without the possibility of parole. <u>Id.</u> at \*27. Moreover, our supreme court has consistently maintained that the appellate review provided for by statute affords a meaningful proportionality review. <u>See</u> <u>Hall</u>, 958 S.W.2d at 719; <u>State v. Brimmer</u>, 876 S.W.2d 75, 87-88 (Tenn. 1994); <u>State v. Cazes</u>, 875 S.W.2d 253, 270-71 (Tenn. 1994). This issue has no merit.

Turning now to the proportionality review of the Defendant's sentences of death, we conclude that his sentences are proportionate to that imposed in similar cases. The jury found two statutory aggravating factors: that the Defendant employed another to commit the murder for remuneration or the promise of remuneration and that the Defendant was previously convicted of one or more felonies involving violence. <u>See</u> Tenn. Code Ann. § 39-13-204(i)(2), (4). The proof established that the Defendant had a previous conviction for second degree murder and that he promised Corey Milliken $5,000.00 to kill his wife and mother-in-law; thus, the aggravating factors are supported by the evidence. There were no statutory mitigating factors present, but the jury was instructed that it could consider the Defendant's work history, family history and relationships, any aspect of the Defendant's background or character which reduces his blameworthiness, and any other factor raised by the evidence. The slight mitigating evidence consisted of testimony that the Defendant was a hard worker, that he was a good neighbor, that he had a good relationship with his son, and that he had a normal family upbringing. After considering the evidence, the jury determined that the aggravating factors outweighed the mitigating factors beyond a reasonable doubt. We conclude that the evidence supports this determination. The Defendant planned the murder of his wife and mother-in-law and employed the services of an eighteen-year-old neighbor to carry out his plan. The victims were awakened in their home by Corey Milliken, who stabbed and strangled Myrtle Wilson and strangled Sandi Stevens.

Our research has revealed several cases in which the death penalty was imposed in a murder-for-hire type situation. In fact, we have found only two appellate cases involving murder-for-hire in which the death penalty was sought but was not imposed by a jury.[1] In <u>State v. Mosher</u>, 755 S.W.2d 464 (Tenn. Crim. App. 1988), the defendant, Evelyn Faye Mosher, hired two men to murder her husband. <u>Id.</u> at 465. Her husband was killed by a plastic drop cloth which was forcibly stuffed

---

[1] We have also found one case in which the defendant was sentenced by a trial judge to life imprisonment instead of death. Pursuant to a trial judge's report prepared in accordance with Rule 12 of the Rules of the Supreme Court, it appears that Alfred Jackson pled guilty to first degree murder in 1977 in a murder-for-hire case. After a capital sentencing hearing conducted before the trial court without a jury, Mr. Jackson was sentenced to life imprisonment. We can find no record of an appeal from that conviction.

down his throat. Id. After a jury trial, the defendant was sentenced to life imprisonment. Id. In the report prepared by the trial judge in accordance with Rule 12 of the Rules of the Supreme Court, the trial judge noted his belief that the passionate plea by the defendant's young daughter played a part in her receiving a life sentence. However, in a separate trial, one of the men hired to murder her husband was convicted of first degree murder and sentenced to death. State v. Wilcoxson, 772 S.W.2d 33, 34 (Tenn. 1989).[2] The jury found three aggravating factors: (1) that the defendant was previously convicted of one or more felonies involving violence; (2) that the defendant committed the murder for remuneration or the promise of remuneration; and (3) that the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind. Id. at 40. No mitigating factors were found. Id.

Additionally, in State v. Groseclose, 615 S.W.2d 142 (Tenn. 1981), three codefendants, William Edward Groseclose, Ronald Eugene Rickman, and Phillip Michael Britt, were tried together and convicted of the first degree murder of Deborah Lee Groseclose, Mr. Groseclose's wife. Id. at 144. Mr. Groseclose and Mr. Rickman were sentenced to death, while Mr. Britt was sentenced to life imprisonment.[3] Id. The proof established that Mr. Groseclose and his wife had been having marital difficulties for some time prior to her death, and Mr. Groseclose planned her death for several weeks before her murder. Id. There was evidence that his motives were based on apprehension of divorce, desire to obtain life insurance proceeds, or interest in another woman. Id. Mr. Groseclose contacted Phillip Michael Britt, who in turn contacted Ronald Rickman about the murder. Id. at 145. Mr. Rickman agreed to perform the murder for a specified price, and Mr. Britt was to share in the proceeds. Id. On the day of the murder, Mr. Rickman and Mr. Britt went to the Groseclose residence, where Ms. Groseclose was home alone. Id. They each had sexual relations with her, and then Mr. Rickman strangled Ms. Groseclose into unconsciousness. Id. He also stabbed her several times near her spinal cord. Id. Thinking she was dead, Mr. Rickman and Mr. Britt placed her body in the trunk of her car and drove it to a parking lot. Id. However, Ms. Groseclose was not dead yet. Id. She was left in the trunk of her car in late June, were she ultimately died from the excessive heat in the trunk of her automobile. Id. at 146.

In sentencing Mr. Groseclose and Mr. Rickman to death, the jury found as aggravating factors for both defendants that it was a murder-for-hire and that the murder was particularly heinous, atrocious, or cruel. See id. at 148. In addition, Mr. Rickman had a substantial record of

---

[2]Mr. Wilcoxson's death sentence was reversed on post-conviction due to ineffective assistance of counsel, and a new sentencing hearing was granted. See Wilcoxson v. State, 22 S.W.3d 289, 293 (Tenn. Crim. App. 2000).

[3]Both William Groseclose and Ronald Rickman received federal habeas corpus relief vacating their convictions due to ineffective assistance of counsel. See Rickman v. Dutton, 864 F. Supp. 686, 716-17 (M.D. Tenn. 1994), aff'd sub nom. Rickman v. Bell, 131 F.3d 1150, 1160 (6th Cir. 1997); Groseclose v. Bell, 895 F. Supp. 935, 961 (M.D. Tenn. 1995), aff'd 130 F.3d 1161, 1171 (6th Cir. 1997). Upon retrial, both were again convicted of first degree murder, but were sentenced to life imprisonment rather than death. In Mr. Rickman's Rule 12 report prepared in accordance with Rule 12 of the Rules of the Supreme Court, the trial judge specifically noted, "Had this case been retried 20 years ago I feel the punishment would have been death. With 20 years of good behavior, the jury felt life was appropriate. Based upon the facts, I felt the aggravating circumstances outweighed the mitigation." We do not believe that this subsequent treatment of Groseclose alters our analysis or the result of this case.

prior criminal activity, and no mitigating circumstances were found. Id. Mr. Groseclose had no prior record, but that was the only mitigating factor found. Id. Although Mr. Britt did not appeal his life sentence, the court noted that there was evidence supporting the jury's decision to grant him a life sentence: he was only nineteen years of age; he had no prior criminal record; he was subject to domination and influence by the older, more mature Rickman; there was evidence that he did not physically engage either in the strangulation or stabbing of the victim; he manifested remorse and regret over the incident; and he freely and voluntarily disclosed the circumstances of the death, including his own participation therein. Id. at 149. The court expressly determined that "the jury did not act arbitrarily or capriciously in imposing the death penalty on appellants while sentencing Britt to life imprisonment." Id.

Furthermore, in State v. Porterfield, 746 S.W.2d 441 (Tenn. 1988), defendant Sidney Porterfield was convicted of first degree murder and defendant Gaile K. Owens was convicted of accessory before the fact to first degree murder. Id. at 443-44. Both defendants were sentenced to death. Id. The proof established that Ms. Owens solicited several men to kill her husband, including Mr. Porterfield. Id. at 444. Ms. Owens arranged to take her two sons out to dinner after evening church services, while her husband remained at the church to play basketball. Id. When Mr. Owens returned home from playing basketball at the church, he was greeted by Mr. Porterfield, who beat him to death with a tire iron. Id. Ms. Owens stated to police that she solicited someone to kill her husband because, "We've just had a bad marriage over the years, and I just felt like he had, mentally I just felt like he had been cruel to me. There was very little physical violence." Id. In imposing a sentence of death, the jury found three aggravating factors with respect to Mr. Porterfield: (1) that he had been previously convicted of one or more felonies involving violence, (2) that he committed the murder for remuneration or the promise of remuneration or employed another to commit the murder for remuneration or the promise of remuneration, and (3) that the murder was especially heinous, atrocious or cruel in that it involved torture or depravity of mind. Id. at 448. The jury found two aggravating factors with respect to Ms. Owens. Id. at 448-49. The factors were the same, except that Ms. Owens had not previously been convicted of a felony involving violence. Id.

In State v. Coker, 746 S.W.2d 167 (Tenn. 1987), the defendant was convicted of first degree murder and sentenced to death upon the jury's finding of two aggravating factors: that the defendant had a prior conviction for a felony involving violence and that he committed the murder for remuneration or the promise of remuneration or employed another to commit the murder for remuneration or the promise of remuneration. Id. at 169. The proof established that the defendant had a relationship with Peggy Price, who was married to the victim, Cletus Price. Id. The defendant and Ms. Price agreed that the defendant would arrange to "get rid" of the victim, and Ms. Price agreed that it would be worth $5,000.00 to do so. Id. Circumstantial evidence established that the defendant hired Mickey Lee Davis to kill Cletus Price. Id. at 170. Cletus Price was shot in the left eye at close range and died almost instantly. Id. at 169.

In State v. Hutchison, 898 S.W.2d 161 (Tenn. 1994), the defendant purchased a large insurance policy on the victim's life, planning to kill the victim, Hugh Huddleston, in order to collect the proceeds. Id. at 164. He conspired with Chip Gaylor, the victim's "trusted 'friend,'" who lured

the victim on a fishing trip so that others could drown him. Id. Mr. Gaylor arranged the fishing trip with the victim and others, but then did not show up that day. Id. at 165. During the fishing trip, the victim, who could not swim, was pushed into the water by persons hired by the defendant. Id. In upholding the death sentence imposed by the jury, the supreme court stated,

> We have complied with the statute and find that the sentence of death was not imposed in an arbitrary fashion and the evidence supports the jury's verdict. The record established that this was a deliberate, premeditated homicide, calculated by the defendant to have the victim killed by others in order to collect the proceeds of a large insurance policy which he had purchased on the victim's life. The evidence supports the jury's finding of the absence of any mitigating circumstances found. We are satisfied that the sentence is neither excessive nor disproportionate to the penalty imposed in similar cases, considering the nature of the crime and the defendant.

Id. at 175.

After examining these cases, we are of the opinion that the Defendant's death sentences are not excessive and are proportionate to the sentences imposed in similar cases. Two aggravating factors were applicable and there was little mitigating evidence. Like Mr. Groseclose, Ms. Owens, and Ms. Mosher, the Defendant planned his spouse's death for some time prior to the murder. While the jury granted mercy to Ms. Mosher by imposing a life sentence, Mr. Groseclose and Ms. Owens were not granted that mercy. They, like the Defendant, had at least two aggravating factors and little mitigating evidence. In addition, the persons hired by Mr. Groseclose, Ms. Owens, and Ms. Mosher all received a death sentence, with the exception of Mr. Britt, who had several factors mitigating his involvement. The Defendant does not have mitigating factors like Mr. Britt. Additionally, the Defendant had the exact aggravating factors as Mr. Coker, who arranged the death of his girlfriend's husband. Accordingly, we find that the Defendant's sentences of death are appropriate, considering the circumstances of the offense and the defendant.

### 10. UNLIMITED PROSECUTORIAL DISCRETION

The Defendant asserts that due to the unlimited discretion of prosecutors in Tennessee as to whether or not to seek the death penalty in a given case, the death penalty is imposed in an arbitrary and disproportionate manner in violation of the Eighth and Fourteenth Amendments to the United States Constitution. He further asserts that the prosecutor's unfettered discretion to seek the death penalty is an improper delegation of judicial power in violation of Article II, section 2 of the Tennessee Constitution. Both of these arguments have been previously rejected by our supreme court.

Applying the United States Supreme Court decision in Gregg v. Georgia, 428 U.S. 153, 198-99 (1976), our supreme court has held that

> opportunities for discretionary action occurring during the processing of a murder case, including the authority of the state prosecutor to select those persons for whom he wishes to seek capital punishment do not render the death penalty unconstitutional

on the theory that the opportunities for discretionary action render imposition of the death penalty arbitrary or freakish.

State v. Cazes, 875 S.W.2d 253, 268 (Tenn. 1994); see also State v. Brimmer, 876 S.W.2d 75, 86 (Tenn. 1994); State v. Hall, 958 S.W.2d 679, 716 (Tenn. 1997).  Moreover, in Hall, our supreme court expressly rejected the assertion that prosecutorial discretion to seek the death penalty violated the separation of powers doctrine found in Article II, section 2, of the Tennessee Constitution.  Hall, 958 S.W.2d at 716-17.  Thus, this issue has no merit.

## 11.  DISCRIMINATORY IMPOSITION OF DEATH PENALTY

Finally, the Defendant argues that the death penalty is imposed in a discriminatory manner on the basis of race, geography, and gender in violation of the Eighth and Fourteenth Amendments to the United States Constitution.  This argument has been rejected by our supreme court.  See Hall, 958 S.W.2d at 717; Brimmer, 876 S.W.2d at 87 n.5; Cazes, 875 S.W.2d at 268.  Furthermore, in support of his argument, the Defendant cites general statistics which he says reflect the discriminatory imposition of the death penalty; yet, the record contains no evidence indicating improper discrimination regarding the sentencing of this Defendant.  Statistics alone are insufficient to establish that the Defendant's sentence was constitutionally deficient.  See McClesky v. Kemp, 481 U.S. 279, 292-97 (1987); Hall, 958 S.W.2d at 717.

## CONCLUSION

After a thorough review of the record, we find no reversible error on the part of the trial court.  Additionally, we conclude that the Defendant's sentences of death are not disproportionate to other cases in which the death penalty has been imposed.  The Defendant's convictions and his sentences of death are therefore affirmed.

_____
DAVID H. WELLES, JUDGE

-38-